Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 1 of 60 PageID 120

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                              1

1
                    UNITED STATES DISTRICT COURT
2                    MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION
3

4
     SAUNDRA E. O'NEAL,
5
          Plaintiff,        CASE NO. 8:15-cv-01089-MSS-EAJ
6
     vs.
7
     ALLIED INTERSTATE, LLC,
8
          Defendant.
9
     ~~~~~~~~~~~~~~~~~~~~~~~
10

11
                    VIDEOTAPED DEPOSITION OF
12
                       SAUNDRA E. O'NEAL
13

14

15                       March 29, 2016

16                  (10:55 a.m. - 12:25 p.m.)

17

18

19                    Greenberg Traurig, P.A.

19                    Bank of America Building
20
            101 East Kennedy Boulevard, Suite 1900
21
                      Tampa, Florida 33602
22

23

24           Julie Haley, RPR, Notary Public

25



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 2 of 60 PageID 121

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    2

```
 1                    APPEARANCES OF COUNSEL

 2

 3   On behalf of the Plaintiff:

 4       W. JOHN GADD, ESQ.
         LAW OFFICE OF W. JOHN GADD
 5       2727 Ulmerton Road, Suite 250
         Clearwater, Florida 33762
 6       727.524.6300
         wjg@mazgadd.com
 7

 8   On behalf of the Defendant:

 9       PATRICK G. BRODERICK, ESQ.
         GREENBERG TRAURIG, P.A.
10       777 South Flagler Drive, Suite 300 East
         West Palm Beach, Florida 33401
11       561.650.7915
         broderickp@gtlaw.com
12

13   Also Present:

14       GRANT SAMPSON, VIDEOGRAPHER

15       BRENDAN LEE, ESQ., IN-HOUSE COUNSEL FOR ALLIED
         INTERSTATE, LLC
16

17

18

19

20

21

22

23

24

25
```



1                    INDEX OF EXAMINATION

2

3    WITNESS:   SAUNDRA E. O'NEAL

4    EXAMINATION                                          PAGE

5    Direct Examination by Mr. Broderick              5

6

7

8

9                    INDEX TO EXHIBITS

10

11   DEFENDANT'S      DESCRIPTION                       PAGE

12   1          Plaintiff's Interrogatory         19
13              Responses
     2          Cell phone pictures of phone      35
14              calls
     3          Cease and Desist Letter           37
15   4          July 12, 2013 letter from         44
                Allied Interstate, LLC
16   5          Thumb Drive                       46

17   (Defendant's Exhibit 5 was retained by Mr. Broderick.)
18

19

20

21

22

23

24

25



1        VIDEOTAPED DEPOSITION OF SAUNDRA E. O'NEAL

2                     March 29, 2016

3

4        THE VIDEOGRAPHER:  This is Tape No. 1 to the

5   videotaped deposition of Saundra O'Neal in the matter of

6   O'Neal versus Allied Interstate, LLC, being heard before

7   the United States District Court, Middle District of

8   Florida, Tampa division, Case Number

9   8:15-cv-01089-MSS-EAJ.

10        This deposition is being held at 101 East Kennedy

11  Boulevard, Suite 1900, Tampa, Florida 33602 on March

12  29th at 10:56.

13        My name is Grant Sampson and I am the

14  videographer.  The court reporter is Julie Haley.

15  Counsel, would you please introduce yourselves and

16  affiliations and would the court reporter please swear

17  in the witness.

18        MR. GADD:  This is John Gadd, here for Ms.

19  O'Neal.

20        MR. BRODERICK:  Patrick Broderick from Greenberg

21  Traurig for the defendant, Allied Interstate.

22        MR. LEE:  Brendan Lee, in-house for iQor and

23  Allied Interstate.

24                    SAUNDRA E. O'NEAL,

25  having been first duly sworn, testified as follows:



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 5 of 60 PageID 124

SAUNDRA E. ONEAL                                            March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                            5

```
 1                      DIRECT EXAMINATION

 2   BY MR. BRODERICK:

 3      Q.  Good morning, can I ask you to please state your

 4   name and address for the record?

 5      A.  Saundra Elizabeth O'Neal.  My address is 1422

 6   Millerman Pines Drive, Apartment 204, Tampa, Florida

 7   33612.

 8      Q.  Ms. O'Neal, my name is Patrick Broderick.  I'm an

 9   attorney for the defendant, Allied Interstate. And I'm

10   going to ask you first, have you ever had your

11   deposition taken before today?

12      A.  Yes, I have taken a deposition before today.

13      Q.  How many times have you been deposed previously?

14      A.  Three or four.  Three or four, I'm not sure.

15      Q.  When was the last time you were deposed?

16      A.  Last month, month before.  Sorry, I can't

17   remember, but it's been recently.  February.  I think.

18   I'm not sure.  I had to go to Clearwater.

19      Q.  And what kind of case was that?

20      A.  It was this one as a matter of fact.

21      Q.  Have you ever appeared before a court reporter

22   before today?

23      A.  No, no.

24      Q.  Have you ever given any testimony in court before

25   today?
```



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 6 of 60 PageID 125

SAUNDRA E. ONEAL                                          March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                          6

1      A.   No.

2      Q.   Have you ever signed an affidavit before, other

3   than this case?

4      A.   No.

5      Q.   Have you ever given any kind of sworn testimony

6   before today?

7      A.   No.

8      Q.   Okay.  Do you understand that the oath you just

9   took is the same oath you would take in a court of law?

10      A.   Yes.

11      Q.   And we have a court reporter here who is taking

12   everything we say down for a written record, and I know

13   there's a videographer.  But is it okay if I ask you

14   answer to answer all questions verbally so that the

15   court reporter can take down the answers?

16      A.   Yes.

17      Q.   And if at any time you don't understand a

18   question, will you please just let me know?

19      A.   Yes, I will.

20      Q.   And if you ever need a break for any purpose

21   whatsoever, can you just let me know that, too?

22      A.   Yes, sir.

23      Q.   The only thing I'd ask is that if you need to

24   take a break, I'd ask that you finish your answer to the

25   prior question and then we can take a break; is that



```
 1   okay?
 2      A.  Yes, that's fine.
 3      Q.  Are you taking any medication today?
 4      A.  No.
 5      Q.  Have you taken any kind of prescription drugs
 6   that would affect your ability to understand my
 7   questions?
 8      A.  No.
 9      Q.  What did you do to prepare for today's
10   deposition?
11      A.  I just prayed.
12      Q.  Did you meet with your counsel at any point in
13   time?
14      A.  Yeah, when I first came in.
15      Q.  Just today?
16      A.  Uh-huh.
17      Q.  That was for about 10 minutes or so?
18      A.  Uh-huh.
19      Q.  Okay.  What is your date of birth?
20      A.  REDACTED      .
21      Q.  That's REDACTED          ?
22      A.  Yes.
23      Q.  You told us your address.  How long have you
24   lived at the address on Miller -- I'm sorry, what was
25   it?
```



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 8 of 60 PageID 127

SAUNDRA E. ONEAL                                           March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                          8

1      A.   Millerman Pines Drive.

2      Q.   How long have you lived at that address?

3      A.   Fourteen months.

4      Q.   And prior to that -- and do you live there with

5  anyone?

6      A.   No.

7      Q.   Prior to the Millerman Pines address, where did

8  you live?

9      A.   Actually, I was homeless before I lived there, at

10  Millerman Pines Drive.

11      Q.   And what dates were you homeless?

12      A.   From 2009 to, like, April -- not April,

13  September, whatever date I got my social security.  But

14  I'd say September 2014.

15      Q.   It's September 2014, where did you move?

16      A.   Millerman Pines Drive.

17      Q.   Did you ever live at an address on Hensel Lane?

18      A.   No.  My African mama lived there.  She let me get

19  my mail there.

20      Q.   Did you ever live there yourself?

21      A.   For about three months.

22      Q.   What three months did you live on Hensel Lane?

23      A.   December to February 2013.

24      Q.   So it would be December 2012 to February 2013?

25      A.   Uh-huh.



```
 1       Q.   You lived on -- is it 14306 Hensel Lane?

 2       A.   Yes.

 3       Q.   That's in Tampa, Florida?

 4       A.   Yes.

 5       Q.   And where did you move after February 2013?

 6       A.   Back to being homeless.

 7       Q.   And after you moved out in February 2013, did you

 8  continue to use the Hensel Lane address as a mailing

 9  address?

10       A.   Yes, I did.

11       Q.   Would you periodically go get your mail?

12       A.   Yes.

13       Q.   When you said you went homeless, was there was a

14  shelter that you stayed in, or where did you stay when

15  you were homeless?

16       A.   Salvation Army.  But I didn't always have the

17  money to stay there, so I didn't always stay there.

18       Q.   Did you stay with friends at any point in time?

19       A.   No.

20       Q.   And how were you able to move to the Millerman

21  Pines address?

22       A.   I got my social security.

23       Q.   And what address did you use to receive your

24  social security?

25       A.   Well, once I got the okay, Millerman Pines Drive.
```



EXHIBIT 2

1   That's where they said.  But the first -- I have one of

2   those green cards that they give out at social security.

3   So that's how I got my first installment.  On the green

4   card.

5       Q.  What is your social security number?

6       A.  REDACTED  8794.

7       Q.  And you told us your name earlier.  Did you have

8   any names prior to O'Neal?

9       A.  Moore.  That's my maiden name.

10      Q.  So you were married to a Mr. O'Neal?

11      A.  Yes.

12      Q.  And what were the dates of your marriage?  When

13  did you get married?

14      A.  1978.  September 7th.

15      Q.  And what was the name of your husband?

16      A.  Clifford.

17      Q.  And how long were you married?

18      A.  Thirteen years.

19      Q.  And are you still in touch with Mr. Clifford

20  O'Neal?

21      A.  Yeah, here and there, we got grandkids.

22      Q.  And what is your current -- well, let me start

23  with this.  How many phones do you have currently, as we

24  sit here today?

25      A.  One.



EXHIBIT 2

1    Q.   And what is the phone number for that one phone?

2    A.   REDACTED  -2707.

3    Q.   And what kind of phone is that?

4    A.   Metro phone.   Metro PCS.

5    Q.   And is that a cellular phone?

6    A.   Yes.

7    Q.   How long have you had that phone number, the 2707

8  phone number?

9    A.   Over a year, about 13 months.

10   Q.   Thirteen months would bring us back to -- you

11 started using it in February 2015?

12   A.   Uh-huh.

13   Q.   Is that the only phone that you have right now?

14   A.   Uh-huh.

15   Q.   And before the Metro PCS 2707 number, did you

16 have any phones before then?

17   A.   I had two.   I had an insurance phone, which is a

18 free phone.   And whatever the other free phone is.

19   Q.   Can you recall the phone numbers?

20   A.   No, I can't.

21   Q.   Did you ever have the phone number REDACTED  -4129?

22   A.   Yeah.

23   Q.   Okay.   What phone was that connected to?

24   A.   That was -- came from Walmart.

25   Q.   Was that a cellular phone?



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 12 of 60 PageID 131

SAUNDRA E. ONEAL                                        March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                        12

1      A.  Uh-huh.

2      Q.  When you say came from Walmart, did you get the

3  phone --

4      A.  StraightTalk.

5      Q.  It was a StraightTalk phone?

6      A.  Yeah, I'm sorry.

7      Q.  And you got it at Walmart?

8      A.  Uh-huh.

9      Q.  And how long did you have that phone?

10      A.  I think I got it around the same time I got the

11  apartment, in September.

12      Q.  September 2014?

13      A.  Uh-huh.

14      Q.  And you held that phone until February 2015?

15      A.  Uh-huh.

16      Q.  And why did you not have that phone after

17  February 2015?

18      A.  Because it don't make no sense to pay for two of

19  them.

20      Q.  Well, going back to your 2707 number, why did you

21  get that phone line?

22      A.  Because I was graduating from the free phones,

23  and the StraightTalk phone is one of those prepaids, but

24  I always ran out of minutes before the money came to buy

25  the card.  So I switched to Metro PCS.



1    Q.  And how much were you paying for the StraightTalk

2  phone, 4129?

3    A.  Forty-eight dollars a month.

4    Q.  And is that -- and then if you went over your

5  minutes, were you charged for more minutes?

6    A.  No.  It's just, it was just like a -- like a

7  30-day card.  Buy it and you have minutes for 30 days,

8  hopefully.

9    Q.  And if you went beyond the minutes, it wouldn't

10 work any longer; is that right?

11   A.  Right.

12   Q.  Then it would start working again the next month?

13   A.  Right, or I bought the replacement card, it would

14 work again.

15   Q.  And have you ever had a phone line, REDACTED -9856?

16   A.  It would be one of the free ones.  509?

17   Q.  REDACTED -9856?

18   A.  Yeah, that's the free phone.

19   Q.  And when would you have had that line?

20   A.  During the time that I was homeless.

21   Q.  Would it have been before the Metro PCS phone?

22   A.  Yeah, way before.  I couldn't afford to pay rent,

23 so why would I pay a phone bill?

24   Q.  And how did you obtain that phone, the 9856

25 phone?



EXHIBIT 2

1      A.  Access phone was outside of Family Dollar, I

2   believe.  Somebody was sitting there with the phone.

3   And they asked if we wanted one.  And we, because there

4   was a group of us at Homeless Recovery.

5      Q.  And a phone was given to you then?

6      A.  Uh-huh.

7      Q.  And how -- did that cost anything per month to

8   have that phone?

9      A.  No, it was minute phone.  They gave you 250

10  minutes a month, and when the 250 minutes ran out, it

11  over until the next, whatever date of the next month.

12     Q.  And have you ever had a phone number

13  REDACTED   -8800?

14     A.  Probably would be one of the free ones, too

15  because I did have two free ones.

16     Q.  Did you have two free phones at the same time or

17  different times?

18     A.  At the same time.

19     Q.  And how would you have gotten more than one free

20  phone?

21     A.  Because -- I don't know what the first company

22  was.  And those people were at Salvation Army.  And then

23  had you to give them an address so they could send you

24  the phone, which I gave them the Hensel Lane address.

25     Q.  And these free phones we're talking about, were



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 15 of 60 PageID 134

SAUNDRA E. ONEAL                                            March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                           15

1  they all cellular phones?

2    A.  Uh-huh.

3    Q.  And did you have to sign any documents in order

4  to get that phone line?

5    A.  Just have to show your food stamp card and your

6  ID.

7    Q.  And were you sent monthly statements on those

8  phone lines?

9    A.  No.  They text you that your minutes were running

10  short.  It's done by text message.

11   Q.  Did you ever -- did you keep those phones after

12  you stopped using them?

13   A.  No.

14   Q.  Discard -- throw them away?

15   A.  Actually I, gave them both to friends of mine

16  that were still homeless.

17   Q.  Were you able to go online on the Internet to see

18  your account for this 8800 phone?

19   A.  No.

20   Q.  Have you ever gone on the Internet to look up a

21  phone line account for any phone?

22   A.  No.

23   Q.  Can you tell me something about -- tell me your

24  educational background?

25   A.  Graduated high school.  I went to school and got



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 16 of 60 PageID 135

SAUNDRA E. ONEAL                                        March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                        16

 1   certified nurse aide certificate.  That's about it.

 2     Q.  Which high school did you go to?

 3     A.  William Mitchell High School in Colorado Springs,

 4   Colorado.

 5     Q.  Did you graduate from high school?

 6     A.  Yes, I did.

 7     Q.  What year did you graduate?

 8     A.  1978.

 9     Q.  And after high school, did you continue your

10   education at any point?

11     A.  I went to the Health Career School in Colorado

12   for the certified nurse aide certificate, PPI Health

13   Career School.

14     Q.  And what dates did you attend that school?

15     A.  1980.

16     Q.  And after going to get your nurse aide

17   certificate, did you ever take any other classes?

18     A.  No.  No.

19     Q.  Did you ever have to incur any student loans to

20   pay for education?

21     A.  I paid that, and they've taken 17,707 of my

22   dollars for the same $1300 loan.  I don't know why

23   you're asking me that.

24     Q.  Well, this loan we're talking about, was it for

25   the nurse aid certificate?



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 17 of 60 PageID 136

SAUNDRA E. ONEAL                                         March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                        17

1    A.   Yeah.

2    Q.   And have you received phone calls about this

3    student loan?

4    A.   Yeah.

5    Q.   How long have you received phone calls about

6    that?

7    A.   Well, I don't receive them no more, because they

8    don't have my phone number.

9    Q.   When did you first start getting phone calls

10   about the student loan?

11   A.   Oh God.  It's before I first went homeless, 2010.

12   Q.   And to your knowledge, was this student loan sent

13   out for collections?

14   A.   Apparently so.  They keep taking my money.

15   Q.   And when you say you recall, was it a collections

16   company that was calling you about the student loan?

17   A.   I don't know.  He didn't say it was a company.

18   He didn't say it was a company.  It's the same person

19   all the time.

20   Q.   And did you make any payments on that student

21   loan?

22   A.   No.  They took 17,707 of my dollars, and nobody

23   is applying it to the loan, nobody.  So no.  No more

24   free money from Saundra, no more.

25   Q.   When you say 17 thousand, you paid 17 thousand on



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 18 of 60 PageID 137

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    18

1  this loan?

2     A.  No.  Every time I applied for taxes, they took my

3  taxes.

4     Q.  So the money was taken out of your tax refunds?

5     A.  Yeah.

6     Q.  And how long?

7     A.  To the tune of 17,707 of my dollars, yeah.

8     Q.  When did that first start that they started

9  taking money out of your tax refunds?

10    A.  My kids were real small and they're adults now.

11 So it's been over 20 years that they've been taking my

12 money.

13    Q.  And do you file for taxes every year?

14    A.  Yeah.

15    Q.  And have you filed in 2016 so far?

16    A.  No, I haven't.

17    Q.  Do you plan on filing your taxes for 2016?

18    A.  I don't know, I'm thinking about it.

19    Q.  And in every year prior to 2016, did you file

20 taxes?

21    A.  Uh-huh.

22    Q.  And --

23    A.  And every year they take my taxes and don't apply

24 it to the loan.

25    Q.  You said they take your tax refund?



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 19 of 60 PageID 138

SAUNDRA E. ONEAL                                          March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                          19

1      A.   Yeah.

2      Q.   We're going to mark as Exhibit 1 certain

3   interrogatory responses.  The court reporter will just

4   put a little sticker on it.

5           (Defendant's Exhibit 1 was marked for

6   identification.)

7   BY MR. BRODERICK:

8      Q.   Okay, we're looking at what's been marked as

9   exhibit one.  It's plaintiff's interrogatory responses.

10  Ma'am, can you remember going over certain questions

11  with your attorneys last year?

12     A.   Uh-huh.

13     Q.   And did you provide certain information for

14  interrogatory responses?

15     A.   Yes, I did.

16     Q.   Can we look at Interrogatory Response Number 2,

17  it will be the second page.  It's asking about your

18  addresses, which we talked about a moment ago.  Do you

19  see where it refers to a Stephanie Simon?

20     A.   Yeah.

21     Q.   Who is Stephanie Simon?

22     A.   She was my roommate.

23     Q.   At what address was she your roommate?

24     A.   1422 Millerman Pines Drive.

25     Q.   Is she still your roommate?



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 20 of 60 PageID 139

SAUNDRA E. ONEAL                                          March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                          20

1        A.  No, she moved back to Palm Beach.

2        Q.  Did she ever share a phone service with you?

3        A.  No.

4        Q.  Did you ever let her use your phone?

5        A.  Yeah.  Couple times.

6        Q.  How many occasions do you think that she used

7   your phone?

8        A.  That Stephanie used my phone?

9        Q.  Stephanie, yeah.

10       A.  Two or three.

11       Q.  And this is while you were roommates?

12       A.  Uh-huh.

13       Q.  What period of time were you roommates with

14   Stephanie Simon?

15       A.  Well, she moved out last month.  So from -- she

16   was there for about six months.

17       Q.  So she was there from say, August of 2015 until

18   the beginning of 2016?

19       A.  Uh-huh.

20       Q.  Did she ever live with you prior to August of

21   2015?

22       A.  No.

23       Q.  That's right?

24       A.  (Witness shakes head.)

25       Q.  Did you have any other roommates at the Millerman



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 21 of 60 PageID 140

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    21

1   Pines address?

2       A.   Yes.   A guy named Eugene Thompson, but he moved

3   in August when Stephanie moved in.

4       Q.   So he moved in August 2015?

5       A.   Uh-huh.

6       Q.   How long had he lived there before he moved?

7       A.   From the time I got the apartment, September of

8   2014.

9       Q.   And going back to your mother's address at Hensel

10  Lane.   Other than your mother, does anyone else live

11  there?

12      A.   No.

13      Q.   During the time period you lived there, did

14  anyone else live there?

15      A.   No, just she and I.

16      Q.   Did you ever share cell phone service with your

17  mother?

18      A.   No.

19      Q.   She had her own phone line?

20      A.   Yeah.

21      Q.   Would anyone else answer your phone while you

22  were living with your mother?

23      A.   No.

24      Q.   In 2013, while you were homeless, did you share

25  the phone -- your phone with anyone?



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 22 of 60 PageID 141

SAUNDRA E. ONEAL                          March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                          22

1    A.  No.

2    Q.  Did anyone else have access to your phone?

3    A.  Well, yeah.  Yeah.  It's a homeless situation, so

4  yeah.  Unfortunately people have access to all your

5  stuff.

6    Q.  And so, do you know it the names of people that

7  would have access to your phone in 2013?

8    A.  No.

9    Q.  When you say they would have had access, how

10  would someone else have access to your phone in 2013?

11    A.  Because they're at Salvation Army, and none of

12  your stuff, unfortunately, is private.

13    Q.  Did it ever come to your attention that someone

14  was using your phone at the Salvation Army?

15    A.  No, but I got my wallet and stuff stolen at the

16  Salvation Army.

17    Q.  Did you ever see someone using your phone at the

18  Salvation Army?

19    A.  No, not unless I gave them permission, here you

20  can use my phone, which I didn't do.

21    Q.  If we look at Interrogatory Response Number 4,

22  which is asking about employment.  Do you see that?

23    A.  Uh-huh.

24    Q.  It says in -- the response reads, "In 2011 I was

25  homeless and unemployed.  In 2012 I got a job at TIA



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 23 of 60 PageID 142

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    23

 1  making sandwiches and salads until I cut myself bad and

 2  had an aneurysm that took my sight away."  I guess my

 3  question is, what is "TIA"?

 4     A.  Tampa International Airport.

 5     Q.  How long did you work at Tampa International

 6  Airport?

 7     A.  About five months.

 8     Q.  What months in 2012 would that have been?

 9     A.  January to May.

10     Q.  And did you have an address during that time or

11  were you still homeless?

12     A.  I was still homeless.

13     Q.  What address did you put on the application to

14  get the job at TIA?

15     A.  Maybe Hensel Lane.

16     Q.  That would have been your mother's address?

17     A.  Uh-huh.

18     Q.  That's yes?

19     A.  Because I didn't -- yes, I'm sorry.  Yes, because

20  I didn't have an address yet.  It was kind of the point

21  of trying to keep working.

22     Q.  And at what point did you have an aneurysm?

23     A.  Well, actually, had the aneurysm the whole time,

24  but I didn't -- had a couple strokes.  I couldn't get my

25  doctor to say, you have an aneurysm.  So after I cut



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 24 of 60 PageID 143

SAUNDRA E. ONEAL                                              March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                              24

 1   myself, about three weeks after that, I had a stroke and
 2   following week I had another stroke.  And I was taken to
 3   Tampa General, and I told that doctor at the emergency
 4   room that I had a sister die from an aneurysm.  They
 5   took me to CT with imaging and found the aneurysm.
 6       Q.  And this is all in 2012?
 7       A.  (Witness nods head.)
 8       Q.  And did you lose your sight at some point?
 9       A.  Yeah.
10       Q.  And how long were you without sight?
11       A.  Not long.  Just about three days after he caught
12   the aneurysm my sight came back.  Blurry and then it got
13   better.
14       Q.  Were you able to see in 2013?
15       A.  Yes.
16       Q.  And since 2013, have you had any problems with
17   your sight?
18       A.  No.
19       Q.  We talked about some of your phones lines, have
20   you ever had an account with Sprint?
21       A.  No.
22       Q.  Did you ever apply for an account with Sprint?
23       A.  No, did I not.
24       Q.  Did you ever get any materials in the mail from
25   Sprint?



1    A.  No, did I not.

2    Q.  Did Sprint ever send you any letters in the mail?

3    A.  No, I never received mail from Sprint.  And I

4    explained to the people that kept calling my phone, when

5    I was at Salvation Army I got my identity stolen.

6    Somebody stole my wallet, ID, social security card,

7    everything.  Then here comes this Sprint phone routine.

8    Q.  When did you get your wallet stolen?

9    A.  It was 2000 -- 2011.  Late 2011.

10   Q.  And how did it come to your attention that

11   someone had stolen your identity?  Had stolen your

12   wallet, I'm sorry?

13   A.  When I came out of the shower at Salvation Army

14   all my stuff was gone through.  I had a backpack and

15   they just went through it, left it like that, took my

16   wallet.

17   Q.  And they took your whole wallet or just took

18   certain things out of it?

19   A.  They took my whole wallet.

20   Q.  What sort of cards did you have in your wallet?

21   A.  I had had my Florida ID, actually, it was a

22   driver's license.  My social security card.  And I had a

23   county insurance card from Hillsborough County.  Couple

24   other things.  Pictures.  Couple of pictures.  The

25   important stuff was my wallet or my ID and the social



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 26 of 60 PageID 145

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                     26

1  security card.

2      Q.  Did you have anything in your wallet that had

3  your mother's address on Hensel Lane?

4      A.  Well, yeah.  I had an address book in there.

5      Q.  You had an address book in there?

6      A.  Uh-huh.  Like one of them little ones that come

7  with a wallet.

8      Q.  And how many different addresses were on that

9  address book?

10     A.  Oh, man, a lot.  My son's, my daughter's.  My

11 African mama.  The church I was going to.  And just a

12 couple more people that had addresses that I knew.

13     Q.  And this theft of your wallet was in 2011?

14     A.  Uh-huh.

15     Q.  That's yes?

16     A.  Yes, sorry.

17     Q.  Sorry, everybody does that.  Did you ever come to

18 know who did that?

19     A.  No.  I suspect, but I didn't have proof of who it

20 was.  I only had my suspicions of who it was.

21     Q.  Who did you suspect had done that?

22     A.  Another girl at Salvation Army.  We looked

23 similar.  Her name was Angie.

24     Q.  Did you report this to the police?

25     A.  I reported to them at Salvation Army, and



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 27 of 60 PageID 146

SAUNDRA E. ONEAL                                      March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    27

 1  eventually I had to keep bitching about it, eventually

 2  they did call the cops.

 3     Q.  Did the police arrive at the Salvation Army?

 4     A.  Uh-huh.

 5     Q.  When did the police arrive?

 6     A.  They didn't come until like the next day, because

 7  I keep bitching about it, bitching, bitching, bitching

 8  until they came.

 9     Q.  What month is this in 2011 that your wallet was

10  stolen?

11     A.  October, I believe.

12     Q.  And you said the police arrived the next day?

13     A.  Uh-huh.

14     Q.  That's yes?

15     A.  Yes, sorry.

16     Q.  Did you give an interview to the police?

17     A.  Yeah.  Somewhat.  They -- they have an attitude

18  about people who are homeless.  So it was like he was

19  being forced to do something he didn't want to do.

20  You're homeless anyway.

21     Q.  Did they -- did the police officer fill out a

22  report?

23     A.  No, actually, he didn't.  Because I was homeless

24  it was like a waste of paper.

25     Q.  Did they ask you to sign any kind of a statement?



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 28 of 60 PageID 147

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    28

1     A.  No.  It was a waste of paper.

2     Q.  Did you ever speak to the police again about your

3  wallet being stolen?

4     A.  No.  It was about useless.  It was useless.

5     Q.  What was Angie's last name?

6     A.  I can't remember.

7     Q.  Did you ever loan Angie your phone?

8     A.  No.

9     Q.  Did it ever come to your attention that she had

10  used your phone?

11    A.  No.

12    Q.  Are you still in contact with Angie?

13    A.  No.

14    Q.  When is the last time you saw Angie?

15    A.  Years and years.  It was the last time I saw her

16  was in 2011, I think.  Pretty sure.

17    Q.  Did anyone else at the Salvation Army have their

18  wallet stolen while you were there?

19    A.  Yeah.  It was like an epidemic, everybody.  I

20  mean, you had to really just hold on to everything you

21  had or it would be gone.

22    Q.  Now, after your wallet was stolen, did it come to

23  your attention that someone was using your identity?

24    A.  Yes, it did.

25    Q.  When did it first come to your attention that



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 29 of 60 PageID 148

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                   29

1   someone was using your identity?

2      A.   It was in 2012, right after I had brain surgery.

3      Q.   I'm sorry what kind of surgery did you have?

4      A.   Brain surgery.

5      Q.   When did you have brain surgery?

6      A.   It was January -- I think it was like June 16th

7   or something like that.

8      Q.   So had you brain surgery on June 16th, 2012?

9      A.   Yeah.

10     Q.   And after that point in time it came to your

11  attention that someone had used your identity?

12     A.   Uh-huh.

13     Q.   That's yes?

14     A.   Yes, sorry.

15     Q.   What was the brain surgery for in 2012?

16     A.   Aneurysm.

17     Q.   And has that surgery affected your ability to

18  remember past events?

19     A.   No, actually.

20     Q.   Have the doctors told you anything about your

21  memory with respect to the surgery that you had?

22     A.   Actually, they're amazed at my recovery.

23     Q.   Is your ability to remember past events different

24  at all?

25     A.   No.



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 30 of 60 PageID 149

SAUNDRA E. ONEAL                                          March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                          30

1      Q.   After the surgery?

2      A.   No.

3      Q.   So it's as good as it was before you had the

4   aneurysm?

5      A.   Uh-huh.

6      Q.   Yes?

7      A.   Yes.

8      Q.   And so you said after your brain surgery, you

9   first came to your attention that someone had used your

10  identity.  How did it come to your attention that

11  someone had used your identity?

12     A.   Well, the first one was at -- somebody had gotten

13  a Payday Loan in my name.  And after a while I started

14  getting calls from Allied about the Sprint phone, and I

15  never had a Sprint phone.

16     Q.   On the Payday Loan, how did you learn that

17  someone used your identity to get a Payday Loan?

18     A.   They first sent me an e-mail.  And I didn't

19  understand -- I didn't know what they were talking

20  about.  I e-mailed them back and then they gave me the

21  date of -- and my correct social security number and --

22  so upsetting.  They gave me my correct social security

23  number and the date that the loan was had, and I was in

24  the hospital at the time that the loan was had.

25     Q.   So you were in the hospital for the brain



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 31 of 60 PageID 150

SAUNDRA E. ONEAL                                        March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                       31

1  surgery?

2      A.  Yes.

3      Q.  So this would have been in June 2012?

4      A.  Uh-huh.

5      Q.  And you got an e-mail -- did the e-mail come

6  through on your phone or did you have a computer, or how

7  did you get the e-mail?

8      A.  I had to go to Metropolitan Ministries then to

9  check my e-mail, because I only had those minute phones.

10  I don't know how they are now, but they were just

11  phones.

12      Q.  Did you speak to anyone at Payday Loan?

13      A.  Yes, I did.

14      Q.  When did you speak to someone at Payday Loan?

15      A.  Well, they called my phone about three weeks

16  after I got the e-mail.  I told them I didn't get the

17  loan.  And I got something from the doctor saying that I

18  was in the hospital at the time.  Actually, they left me

19  alone about it.

20      Q.  This is June and July of 2012 issue were you

21  concerned then that someone had gotten your information?

22      A.  Of course I was.  I was concerned at the time,

23  but what could I do.  Replace my social security card

24  and my ID, that's all I could, personally, do.  And

25  deny, deny, deny that I got a loan or a phone.


EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 32 of 60 PageID 151

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                              32

1    Q.  Did you have your social security number changed?

2    A.  No.  You can't change your social security

3    number.

4    Q.  Did you -- in June or July of 2012 after you

5    realized that Payday Loan was attempting to collect on a

6    loan, did you contact the police at that time?

7    A.  No.  I was still homeless.  It's still a waste of

8    paper.

9    Q.  Did you contact anyone else for help?

10   A.  No.

11   Q.  How long did Payday Loan communicate with you?

12   A.  After I sent them proof that I was in the

13   hospital at the time, they left me alone.

14   Q.  This would have been 2012?

15   A.  Yeah, summertime.

16   Q.  If you could look at the interrogatories, look at

17   Interrogatory Number 10.  You see how -- your response

18   to Interrogatory 10, which is talking about accounts,

19   debts, loans, credit lines, do you see how it refers to

20   Department of Education?

21   A.  Uh-huh.

22   Q.  That's what we talked about earlier about your

23   student loans?

24   A.  Uh-huh.

25   Q.  It also talks about a face cream from a solicitor



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 33 of 60 PageID 152

SAUNDRA E. ONEAL                          March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                          33

1   or debt collector, do you see that?  Do you see there

2   where it says, response, I have had a lot of calls from

3   Allied and a few about face cream from a solicitor, do

4   you see where I'm reading?

5       A.  Uh-huh.

6       Q.  What was the face cream from a solicitor, what

7   was that right there?

8       A.  Some kind of face cream that I supposedly

9   ordered.

10      Q.  Did you order a face cream?

11      A.  No.

12      Q.  How did they contact you?

13      A.  On the phone.  And it had to have been one of the

14   minute phones.

15      Q.  When did the collector for the face cream start

16   calling you?

17      A.  I couldn't remember exactly when they started

18   calling me, but I am thinking it was around the time I

19   was at Hensel Lane.

20      Q.  Around the time you were living with your mother?

21      A.  Uh-huh.

22      Q.  And had you ever opened an account for face

23   cream?

24      A.  Uh-uh.

25      Q.  Did you ever order any face cream?



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 34 of 60 PageID 153

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    34

1      A.   No.

2      Q.   And how many times did the face cream collectors

3   call you?

4      A.   Four or five, maybe six.  Not very often.

5      Q.   Did you speak to them at any point?

6      A.   Yes, I did.

7      Q.   What did you tell them when you spoke to them?

8      A.   That my identity had been stolen and I didn't

9   incur the debt.  Whoever took my ID and my social

10   security card has been very busy with it, thank you very

11   much.

12      Q.   I'm sorry, what year did you live with your

13   mother, for those three months?  I'm sorry, I think you

14   told me before --

15      A.   2011.

16      Q.   -- it was December 2012 to February 2013; does

17   that sound right?

18      A.   December, yeah.

19      Q.   2012?

20      A.   Yeah.

21      Q.   And then three months later would have been

22   February 2013?

23      A.   Yeah.

24      Q.   It was during this time that the face cream

25   collector called you?



EXHIBIT 2

1      A.  Uh-huh.

2      Q.  By that point in time that was the second time

3  you realized someone had used your identity?

4      A.  Yeah.

5      Q.  Other than the Payday Loan and the face cream,

6  were there any other people trying to collect on a debt

7  between those two periods of time, between the time of

8  your surgery in June 2012 and the time you moved out of

9  your mother's house in February 2013.  You told us about

10  the face cream and you told us about the Payday Loan,

11  were there any other companies attempting to collect the

12  debt?

13     A.  Outside of Allied, no, not that I recall.

14     Q.  Okay.  When is the first time you can recall

15  being called by Allied?

16     A.  I was probably with my mom.  I was with my mom.

17  I remember getting three calls in a day and being real

18  upset about it.

19     Q.  I'm going to show you what we received in

20  discovery.  I'm going to mark this as Exhibit Number 2.

21  Just hand that to the count reporter and she'll put a

22  sticker on it.

23          (Defendant's Exhibit 2 was marked for

24  identification.)

25

EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS  Document 20-2  Filed 04/01/16  Page 36 of 60 PageID 155

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    36

 1  BY MR. BRODERICK:

 2     Q.  Ms. O'Neal, Exhibit No. 2 is a 15-page document.

 3  Can you tell us what it is?

 4     A.  It's the phone calls for bill collection.

 5     Q.  It looks like a picture of a cell phone; is that

 6  fair?

 7     A.  Uh-huh.

 8     Q.  That's yes?

 9     A.  Yes.

10     Q.  And is the phone in the picture, is that your

11  phone?

12     A.  Yeah, it looks like one of the minute phones.

13     Q.  Can you tell by looking at it what phone line

14  this phone was connected to?

15     A.  They were exactly the same, so I can't say

16  exactly which phone it is.

17     Q.  And the first page appears to have a -- details,

18  it says, details, bill collection, and then it has an

19  800 number and it says 3:13 p.m. 11/14, do you see that?

20     A.  Uh-huh.  Yes, I do.

21     Q.  You said you might have had more than one phone

22  at certain periods of time.  Did Allied ever call you on

23  more than one phone?

24     A.  Yes.

25     Q.  What phone?



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 37 of 60 PageID 156

SAUNDRA E. ONEAL                                     March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                   37

1   A.  How they got my number, I don't know.  I don't

2   know.  But go ahead, I'm sorry.

3   Q.  No, I'm sorry.  And so I guess my question is

4   about this Exhibit 2, who took these pictures of your

5   phone?

6   A.  The lady that works for my attorney.

7   Q.  So someone in Mr. Gadd's office took these

8   pictures?

9   A.  Uh-huh.

10   Q.  And you had -- and when did that occur?  When did

11   that person take those pictures?

12   A.  It was after we sent the cease and desist letter.

13   Q.  When did you first speak to someone at Mr. Gadd's

14   office about debt collection calls?

15   A.  Had to be in 2013, because I didn't know at

16   first, nobody told me that you could sue people for

17   harassing you on the phone and they gave me one of his

18   cards.  It had to have been -- I don't know.

19   Q.  Let's mark as Exhibit Number 3, just hand that to

20   the court reporter.

21       (Defendant's Exhibit 3 was marked for

22   identification.)

23   BY MR. BRODERICK:

24   Q.  Exhibit Number 3 is a two-page document, the

25   second page in the upper right has a date of November



1   20, 2013, do you see that ma'am?

2    A.   Uh-huh.

3    Q.   Is this cease and desist letter that you were

4   referring to just a moment ago?

5    A.   Yes.

6    Q.   If it's dated November 20, 2013, how long before

7   that did you speak to Mr. Gadd's office?

8    A.   I called to make an appointment like a couple of

9   days before I made it here. And then I came and I

10   showed all the phone calls on my phone, and we did this

11   cease and desist letter, the same day that I went there.

12    Q.   So the cease and desist letter on November 20th,

13   2013 was the same day you visited Mr. Gadd's office?

14    A.   Uh-huh.

15    Q.   And that was your first visit with Mr. Gadd?

16    A.   Yes.

17    Q.   And had you spoken to anyone -- not asking you

18   what you talked about, but did you speak to anybody at

19   Mr. Gadd's office before that visit on November 20th?

20    A.   Just to make the appointment.

21    Q.   And that was how long before?

22    A.   About a week.

23    Q.   And at that point you made -- I mean pictures

24   were taken of your phone, which we looked at on Exhibit

25   2?



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 39 of 60 PageID 158

SAUNDRA E. ONEAL                                              March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                            39

1     A.   Uh-huh.

2     Q.   In looking through Exhibit 2, these are the phone

3  records, do you see how the first page has a date,

4  reflects -- looks like a call on November 14, 2014 and

5  then if you flip all the way to the last page of Exhibit

6  2, the last call is November 29; do you see that?

7     A.   Yeah.

8     Q.   And are these calls from 2013?

9     A.   Well, apparently not, it says 2014 on the phone.

10    Q.   I'm sorry say that?

11    A.   It says 2014 on the phone.

12    Q.   You know if we flip through, I think 11/14 means

13  November 14th.

14    A.   Yeah.

15    Q.   So where are you seeing 2014 on the phone?

16    A.   I'm thinking this is 11/2014.

17    Q.   Because if we flip through, you'll see different

18  numbers after the 11.  I guess my question is, are these

19  calls in Exhibit 2, are they from 2013?

20    A.   Yeah.  I had had -- I didn't delete any of them,

21  so -- before I came to the office I didn't delete any of

22  them.

23    Q.   And then since that time, have you deleted any of

24  the calls?

25    A.   Well, since I got my new phone I'm not receiving



 1   any calls, but I didn't delete any of them.

 2       Q.  And do you have this phone that's depicted in

 3   Exhibit 2?

 4       A.  I don't have it anymore.

 5       Q.  Okay, where would that phone have gone?

 6       A.  I gave it to somebody I knew that was still on

 7   the street.  When I got my StraightTalk phone, I gave

 8   the minute phones to people that were still -- two of

 9   them, one to a guy, one to a girl.

10       Q.  When did you do that?

11       A.  I moved in around the middle of the month in

12   September '14.  So at around Thanksgiving.

13       Q.  In looking at this Exhibit 2, the first calls on

14   November 14 on this document, did you get any calls from

15   Allied before November 14?

16       A.  Yeah, a lot of them, actually.

17       Q.  But they -- those calls weren't reflected in your

18   phone any longer?

19       A.  No.  Because it would like -- I want to say roll

20   over, but they --

21       Q.  The more recent calls are in your phone, but the

22   old ones get deleted?

23       A.  Right.

24       Q.  And so when is the first time you can remember

25   getting a call from Allied?



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 41 of 60 PageID 160

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    41

1      A.  It was in 2013.  And I was with my mom, actually.

2   Because she was trying to tell me to calm down.  I was

3   real upset.  She was trying to get me to calm down.

4      Q.  When you say calm down, did you know what the

5   call was for when you got the call, the first call from

6   Allied?

7      A.  Yeah, they said it was for a phone.

8      Q.  Did you speak to anyone the first time Allied

9   called?

10      A.  Yeah.  I mean, whoever called me the first time,

11   all the way up to the seventh or eighth time, I told

12   them, listen, I got my identity stolen, my social

13   security card and my ID were stolen, and here pops all

14   these calls, I owe this and I owe that.  And when -- I

15   didn't get a phone.  I told them immediately that my

16   identity was stolen.  I told them immediately.

17      Q.  You told Allied immediately?

18      A.  Uh-huh.

19      Q.  What did Allied say in response when you said

20   your identity was stolen?

21      A.  Something about I had to fill out a form stating

22   that, some kind of form, and I understood that they were

23   going to send me the form, but I never received the

24   form.

25      Q.  Were you receiving mail at that point in time?



Case 8:15-cv-01089-MSS-AAS  Document 20-2  Filed 04/01/16  Page 42 of 60 PageID 161

SAUNDRA E. ONEAL                                          March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                          42

 1     A.  Uh-huh.

 2     Q.  You were getting mail at your mother's house?

 3     A.  Yes.

 4     Q.  Did Allied ask you to contact Sprint during this

 5  phone conversation?

 6     A.  No, I never contacted Sprint.

 7     Q.  Did Allied ever ask you to contact Sprint?

 8     A.  No.

 9     Q.  Did Allied ever ask you to call Sprint's fraud

10  line?

11     A.  Yeah, that was probably it.  Fraud line.  I

12  remember that -- those words, fraud line.  So yeah.

13     Q.  And did you call Sprint's fraud line?

14     A.  Yes, I did.  And I told them that my identity was

15  stolen.  I gave them around the date that I thought that

16  it was stolen.  And I told them I never got a Sprint

17  phone.

18     Q.  What phone did you use to call Sprint?

19     A.  Probably one of the minute phones.

20     Q.  It could have been the same phone that Allied was

21  calling you on?

22     A.  Uh-huh.

23     Q.  That's yes?

24     A.  Yes, I'm sorry.

25     Q.  And did Sprint send you any documents or



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 43 of 60 PageID 162

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    43

1    information after you called that fraud line?

2        A.  No, they didn't.

3        Q.  Did you ever speak to Sprint again after making

4    that phone call?

5        A.  Yeah.  Asking for money.  They were asking for

6    money.

7        Q.  We're talking about Sprint now, not Allied.

8    Sprint called you?

9        A.  Yeah.

10       Q.  This is after you talked to the fraud line?

11       A.  Yeah.

12       Q.  When did Sprint ask you for money?

13       A.  They called, like, two weeks after I told them

14   that I got my identity stolen.  And I started screaming.

15   I started screaming.  I didn't have money to pay rent,

16   so why would I get a phone bill where I had to pay.

17   Well, it's going to go to collections.  Well, I can't

18   pay for something I didn't get.  I'm not paying for it.

19       Q.  How many times, total, did you speak to Sprint?

20   You called once to the fraud line and once they called

21   you for money, there were any other times when you spoke

22   to Sprint?

23       A.  Two times and they quit calling, because I

24   wouldn't stop screaming.  Honestly, I wasn't very nice

25   about it.



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 44 of 60 PageID 163

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    44

1    Q.  After speaking to Allied and they mentioned the

2    Sprint fraud line, did you ever speak to Allied again on

3    the phone?

4    A.  They kept calling, calling, and calling and

5    calling, and calling, and then it got where I knew the

6    number, and I just quit answering the phone.

7    Q.  Can you tell when you stopped answering, stopped

8    speaking to Allied?

9    A.  Actually, after I went to Mr. Gadd's office, I

10   talked to them a couple times to find out the name of a

11   guy and what time they were calling, which I needed to

12   do.  And after I got the guy's name and the date that he

13   was calling, calling me, and that was, like, 2013 some

14   time.

15   Q.  I'm going to mark as Exhibit 4.

16        (Defendant's Exhibit 4 was marked for

17   identification.)

18   BY MR. BRODERICK:

19   Q.  Ma'am, we've marked as Exhibit 4 a July 12th,

20   2013 letter from Allied Interstate.  My first question

21   is, do you recall ever getting this letter?

22   A.  No.

23   Q.  Can you recall getting any letters from Allied

24   Interstate?

25   A.  No.



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 45 of 60 PageID 164

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    45

1    Q.  You see in the first page of the letter, which

2    bears Bates label Allied/O'Neal 000003, the first page

3    of the letter is addressed to Saundra O'Neal at 14306

4    Hensel Lane, Apartment 259; do you see that, ma'am?

5    A.  Uh-huh.

6    Q.  Is that your mother's address?

7    A.  Uh-huh.

8    Q.  How often would you go to your mother's residence

9    to get your mail?

10   A.  Every two weeks.

11   Q.  And would it be the first of the month and the

12   15th of the month or just?

13   A.  Yeah, about that.

14   Q.  Can you recall ever getting a letter like this at

15   your mother's address?

16   A.  No.

17   Q.  Did your mother ever tell you that you gotten

18   mail from Allied?

19   A.  No.

20   Q.  Is today the first time you've seen this July

21   2013 letter?

22   A.  Yeah.

23   Q.  In July 2013, were -- did you know as of July

24   that someone had used your identity?

25   A.  Yeah.



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 46 of 60 PageID 165

SAUNDRA E. ONEAL                                          March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                          46

1      Q.   And you knew that because of the prior incidents

2   that we talked about?

3      A.   Yeah.

4           MR. BRODERICK:   Counsel, we're going to mark as

5   Exhibit 5, a thumb drive of the call recording, and then

6   we're going to play the recording for Ms. O'Neal.   I

7   just have a couple of questions after we listen to that

8   recording.

9           So we're going to mark as exhibit a thumb drive

10  that just says O'Neal on it.

11          (Defendant's Exhibit 5 was marked for

12  identification.)

13  BY MR. BRODERICK:

14     Q.   Ma'am, I'm going to -- we have a recording from a

15  call as of July 16, 2013, and I want to you to listen to

16  the call, and I just have a couple questions about the

17  call.   Assuming I can get it to play.

18              (Audio played as follows.)

19          CALLER:   Hello?   Somebody called me from this

20  number.

21          ALLIED:   This call is recorded.

22          CALLER:   Who is it?

23          ALLIED:   (Inaudible) right now, ma'am.   Is this

24  Saundra O'Neal?

25          CALLER:   Yes, it is.



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 47 of 60 PageID 166

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    47

1          ALLIED:  From Tampa, Florida?

2          CALLER:  Who is it?  Yes.

3          ALLIED:  Okay.  My name is Sharnell Johnson.  I'm

4    calling from Allied Interstate, LLC, a collection agency

5    attempting to collect a debt, and any information

6    obtained will be used for that purpose.  I see you have

7    a balance of $379.97 with Sprint.  How would you like to

8    take care of that today?

9          CALLER:  Oh, well, it's not going to be today.

10   More like Friday afternoon, that's when I get paid.

11         ALLIED:  Okay.  Would you like to set up a

12   payment arrangement?  Ma'am?  Hello?  Hello?

13                (Audio interrupted.)

14         THE WITNESS:  That's not me, I didn't have a job

15   then.

16                (Audio continued.)

17         ALLIED:  Dropped the call, no response.

18                (Audio concluded.)

19   BY MR. BRODERICK:

20     Q.  That's the end of the recording.  My first

21   question for you, ma'am, was that your voice on that

22   recording?

23     A.  No.

24     Q.  Did you ever -- well, does that voice sound

25   familiar to you?



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 48 of 60 PageID 167

SAUNDRA E. ONEAL                                        March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                        48

1    A.  Not really.  Not really.  It's not my mom.  It

2  wasn't me.  And I didn't have a job in 2013 at all.  I

3  didn't have a job at all.

4    Q.  Was there anyone else in July 2013 that was

5  answering your phone?

6    A.  Not that I know of.  Just stupidly laying around.

7  I didn't think it would have.  I was still in and out of

8  Salvation Army.

9    Q.  As you sit here today, do you have any idea whose

10  voice was on that recording?

11    A.  No.  No.

12    Q.  Did you ever record any conversations that you

13  had with Allied?

14    A.  No.

15    Q.  Did you ever take notes --

16    A.  I wish I had.

17    Q.  I'm sorry?

18    A.  I said, I wish I had.

19    Q.  Did you ever take notes from when Allied was

20  calling?

21    A.  Only once, and that was just to take him the name

22  of the guy that was calling.  I don't remember his name.

23  I wrote it down.  I took to the office.

24    Q.  Do you still have that writing?

25    A.  No.



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 49 of 60 PageID 168

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                   49

1    Q.  Ma'am, why did you bring this lawsuit against

2    Allied?

3    A.  Well, because I'm tired of getting ripped off for

4    one thing, and because somebody said that you could get

5    a lawsuit going on about these harassing phone calls.

6    So -- and they gave me John's card.  So I checked, and

7    he said I had a case, so okay.  Try to get some of my

8    money, my dignity back. Oh.

9    Q.  How did the phone calls from Allied affect your

10   life?

11   A.  Well, very negatively.  Because when you're

12   homeless, everywhere you turn you're beat down anyways.

13   So to me this was just another way of beating me.  Hard

14   to make a -- hard -- making it hard for me to get back

15   up from this spot that I was.  Very negative effect.

16   And everybody that wants money, because you got your

17   identity stolen, not just Allied, everybody.

18   Q.  Was there anything that Allied told you over the

19   phone that affected you?

20   A.  Just the assist -- insistence that I pay a debt

21   that I didn't owe.  Added to depression I was going

22   through.  Just added to it.

23   Q.  Other than insisting that you pay a debt that you

24   didn't owe, did Allied say anything else during these

25   calls that affected your life?



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 50 of 60 PageID 169

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                              50

1     A.  Well, some of the people that called were kind of

2   threatening with it, which you can't get blood out of a

3   turnip, but people still, you know, have a threatening

4   demeanor sometimes.

5     Q.  How?

6     A.  A couple of them did with me, but there was the

7   girls that had threatening demeanor.  I mean, you still

8   can't get blood out of a turnip, so.

9     Q.  What, specifically, did Allied say that you found

10  threatening?

11    A.  That it was going to mess up my credit report.

12  What else can you do to my credit report?

13    Q.  You already had a bad credit report at the time?

14    A.  Yeah.  And I couldn't -- I refused to pay for

15  something that I didn't -- I didn't do this.  And I

16  already got ripped off, so I'm not going to get ripped

17  off again.  I didn't do this.

18    Q.  Other than mentioning your credit report; was

19  there anything else that Allied said that you found

20  threatening?

21    A.  No, just the credit report thing.

22    Q.  You mentioned a moment ago that you were

23  depressed.  Had you ever gone to a doctor for

24  depression?

25    A.  Yeah.



SAUNDRA E. ONEAL                                  March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                              51

1     Q.   When did you first go to a doctor for depression?

2     A.   Way before that.  About 2008.

3     Q.   What doctor did you see for depression?

4     A.   I don't know her first name, but her last name

5   was Patel.

6     Q.   P-A-T-E-L?

7     A.   Yeah.

8     Q.   Is Dr. Patel a psychiatrist?

9     A.   Yeah.

10    Q.   Is Dr. Patel in Tampa?

11    A.   Yeah.

12    Q.   Where in Tampa is Dr. Patel's office?

13    A.   Well, she used to be around the corner from

14  Salvation Army.  What the name of the street?  Salvation

15  Army is on North Florida, and I think it had the same

16  address as the Family Health Center.

17    Q.   And when did you first see Dr. Patel?

18    A.   2008.

19    Q.   Why did you see Dr. Patel in 2008?

20    A.   Because I was on a serious crying jag, real bad,

21  real bad.  And I went to her and she put me on Xanax,

22  which I didn't want, so she gave me Lexapro instead.

23    Q.   This is in 2008 that Dr. Patel prescribed Xanax,

24  then Lexapro?

25    A.   Uh-huh.



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 52 of 60 PageID 171

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                              52

1    Q.  How long did you see Dr. Patel?

2    A.  Until 2013.

3    Q.  Can you recall what month in 2013 you stopped

4  seeing Dr. Patel?

5    A.  No.  I think it was summertime maybe.

6    Q.  And why did you stop seeing Dr. Patel?

7    A.  Because she had me on a whole grocery bag full of

8  pills.  Whole grocery bag.  And I asked her, how much do

9  you get paid every time you put me on some addictive --

10  something addictive.  She got mad.

11    Q.  After -- after you stopped seeing Dr. Patel, did

12  you see any other psychiatrists after that point in

13  time?

14    A.  No.  I just go in to my regular doctor.

15    Q.  Okay, have you been treated for depression at all

16  after Dr. Patel?

17    A.  I still get pills for depression from my regular

18  doctor.

19    Q.  Who is your regular doctor?

20    A.  I think it's Brian White.

21    Q.  I'm sorry?

22    A.  Brian White.  W-H-I-T-E.

23    Q.  Where does Dr. White keep offices?

24    A.  His office is around the corner from Salvation

25  Army at the Family Health Center.



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 53 of 60 PageID 172

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    53

1    Q.   What medication does Dr. White prescribe for you?

2    A.   Blood pressure medicine and Lexapro.

3    Q.   After seeing -- after you stopped seeing Dr.

4    Patel, did you continue to get prescriptions for

5    Lexapro?

6    A.   Well, it was a big to-do between her and Dr.

7    Brian, but yeah, she somehow said it was all right for

8    him to write the prescription for me.

9    Q.   And after you started seeing Dr. White for your

10   prescriptions, did the amount of Lexapro increase or

11   decrease or stay the same?

12   A.   It decreased.

13   Q.   So you started taking less Lexapro?

14   A.   Uh-huh.

15   Q.   Other than Dr. Patel and Dr. White, is there

16   anyone else that's prescribed you medication for

17   depression?

18   A.   No.

19   Q.   Are you still taking Lexapro?

20   A.   Not really.

21   Q.   When is the last time you used Lexapro?

22   A.   December 15.

23   Q.   Couple of months ago?

24   A.   Uh-huh.

25   Q.   Why did you stop using at that time?



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS  Document 20-2  Filed 04/01/16  Page 54 of 60 PageID 173

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    54

1    A.  Well, my lip swole up the last couple times I

2  used it, which is a sign that you've become allergic to

3  it, so -- I haven't been back to the doctor.  I feel all

4  right.

5    Q.  A moment ago you said that Allied's calls added

6  to your depression, how did the calls add to your

7  depression?

8    A.  Well, because I was homeless, depressing.

9  Somebody stole my identity, depressing.  Somebody is

10  buying stuff with my identity, depressing.  Trying to

11  get up out of being homeless, depressing.  Call the

12  cops, somebody stole my identity, yeah, this is all a

13  waste of paper -- for the cops to say that in your face.

14       MR. BRODERICK:  Counsel, can we take a five

15  minute break?

16       MR. GADD:  Sure.

17       THE VIDEOGRAPHER:  We're off the record at 12:18.

18       (Recess.)

19       THE VIDEOGRAPHER:  We are back on the record at

20  12:25.

21       MR. BRODERICK:  Ms. O'Neal, I have no further

22  questions for you at this time.

23       THE WITNESS:  Okay.  Thank you.

24       MR. GADD:  None from me.

25       THE VIDEOGRAPHER:  This concludes today's



```
 1   videotaped deposition of Saundra O'Neal, taken on March

 2   29th, 2016.  We are off the record at 12:25.

 3          (Deposition was concluded at 12:25 p.m.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA    )

 4   COUNTY OF HILLSBOROUGH  )

 5

 6        I, JULIE HALEY, Court Reporter, and Notary

 7   Public, State of Florida, certify that SAUNDRA E. O'NEAL

 8   personally appeared before me on the 29th day of

 9   March, 2016 and was duly sworn.

10

11

12        SIGNED THIS 31st day of March, 2016.

13

14

15        _____

16        JULIE HALEY, RPR

17        Notary Public, State of Florida

18

19

20

21

22

23

24

25
```



Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 57 of 60 PageID 176

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    57

```
 1              CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA   )

 4   COUNTY OF HILLSBOROUGH )

 5

 6       I, JULIE HALEY, Court Reporter and Notary Public,

 7   State of Florida, do hereby certify that I was

 8   authorized to and did stenographically report the

 9   deposition of SAUNDRA E. O'NEAL; that a review of the

10   transcript was requested; and that the foregoing

11   transcript, pages 1 through 60 is a true record of my

12   stenographic notes.

13       I FURTHER CERTIFY that I am not a relative,

14   employee, or attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am I

17   financially interested in the action.

18

19       DATED this 31st day of March, 2016.

20

21                           Julie Haley

22                    _____

23                    JULIE HALEY, RPR

24                    Notary Public, State of Florida

25
```



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 58 of 60 PageID 177

SAUNDRA E. ONEAL                                    March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                    58

```
 1          DEPOSITION ERRATA SHEET

 2

 3   Our Assignment No. J0327167

 4   Case Caption:  SAUNDRA E. O'NEAL v. ALLIED INTERSTATE,

 5   LLC

 6

 7

 8     DECLARATION UNDER PENALTY OF PERJURY

 9          I declare under penalty of perjury

10   that I have read the entire transcript of

11   my Deposition taken in the captioned matter

12   or the same has been read to me, and

13   the same is true and accurate, save and

14   except for changes and/or corrections, if

15   any, as indicated by me on the DEPOSITION

16   ERRATA SHEET hereof, with the understanding

17   that I offer these changes as if still under

18   oath.

19          Signed on the _____ day of

20   _____, 20_____.

21

22   _____

23          SAUNDRA E. O'NEAL

24

25
```



EXHIBIT 2

Case 8:15-cv-01089-MSS-AAS   Document 20-2   Filed 04/01/16   Page 59 of 60 PageID 178

SAUNDRA E. ONEAL                                          March 29, 2016
O'NEAL vs. ALLIED INTERSTATE                                        59

1          DEPOSITION ERRATA SHEET

2    Page No.____Line No.____Change to:_____

3    _____

4    Reason for change:_____

5    Page No.____Line No.____Change to:_____

6    _____

7    Reason for change:_____

8    Page No.____Line No.____Change to:_____

9    _____

10   Reason for change:_____

11   Page No.____Line No.____Change to:_____

12   _____

13   Reason for change:_____

14   Page No.____Line No.____Change to:_____

15   _____

16   Reason for change:_____

17   Page No.____Line No.____Change to:_____

18   _____

19   Reason for change:_____

20

21   SIGNATURE:_____DATE:_____

22          SAUNDRA E. O'NEAL

23

24

25



EXHIBIT 2

```
 1              DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20

21    SIGNATURE:_____DATE:_____

22              SAUNDRA E. O'NEAL

23

24

25
```



EXHIBIT 2