o'neal.txt

1

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF FLORIDA

3  TAMPA DIVISION

4  IN RE: O'NEAL vs. Allied INTERSTATE, LLC.

5          CASE NO: 8:15-cv-01089

6          DEPO OF: JONATHAN JUAREZ

7          TAKEN: March 30, 2016

8

9

12:36 10          D I S C L A I M E R

11

12          THIS REALTIME TEXT IS UNEDITED/UNCERTIFIED

13  AND WILL CONTAIN UNTRANSLATED STENOGRAPHIC SYMBOLS,

14  OCCASIONAL REPORTER NOTES, MISSPELLED PROPER NAMES, AND/OR

15  NONSENSICAL WORD COMBINATIONS.  ALL SUCH ENTRIES WILL BE

16  CORRECTED ON THE OFFICIAL CERTIFIED TRANSCRIPT.

17

18          THIS REALTIME TEXT IS FOR THE PURPOSE OF

19  AUGMENTING COUNSEL'S NOTES AND SHALL NOT BE RECOGNIZED AS

20  AN OFFICIAL TRANSCRIPT, NOR SHALL IT BE CITED OR USED IN

21  ANY WAY OR AT ANY TIME TO REBUT OR CONTRADICT THE OFFICIAL

22  CERTIFIED TRANSCRIPT OF THE PROCEEDINGS, PURSUANT TO

23  APPLICABLE COURT RULES.

24

08:20          REALTIME UNEDITED/UNCERTIFIED TEXT

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

⚥

2

IN THE UNITED STATES DISTRICT COURT

EXHIBIT 6

o'neal.txt

FOR THE MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

```
SAUNDRA E O'NEAL,              )
                              )
      Plaintiff,              )
                              )
vs.                           )   No. 8:15-CV-01089
                              )
ALLIED INTERSTATE, LLC,       )
                              )
      Defendant.              )
                              )
```

DEPOSITION OF JONATHAN JUAREZ

Phoenix, Arizona
March 30, 2016
Time a.m.

REPORTED BY:
YVONNE L. WHITEFIELD, RPR, CSR
Certificate No. 50611

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

                                              3

1          DEPOSITION OF JONATHAN JUAREZ was taken on March

2   30, 2015, commencing at time a.m. at the offices of

3   Bartelt Reporting, LLC, 111 W. Monroe Street, Suite 425,

4   Phoenix, Arizona, before YVONNE L. WHITEFIELD, a Certified

Page 2

EXHIBIT 6

o'neal.txt

 5   Court Reporter in the States of Arizona and California.

 6   COUNSEL APPEARING:

 7

     Representing Plaintiff:
 8
          [!FIRM2]
 9        By: W. JOHN GADD, ESQ. (Telephonic)
          [!ADDRESS-A2]
10        [!ADDRESS-B2]
          [!CITY2], [!STATE2]  [!ZIP2]
11
     Representing Defendant:
12
          GREENBERG TRAURIG
13        By: PATRICK G. BRODERICK, ESQ.
          777 South Flagler Drive
14        Suite 300 East
          West Palm Beach, Florida 33401
15        (561)650-7915

16   Also present: Brendan Lee, Chief Litigation Counsel
     (Telephonic)
17

18

19

20

21

22

23

24

25


          UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

                                                      4


 1                     JONATHAN JUAREZ,

 2   a witness herein, having been first duly sworn by the

 3   Certified Court Reporter to speak the truth and nothing

 4   but the truth, was examined and testified as follows:

 5

 6                     EXAMINATION

 7   BY MR. GADD:
                         Page 3

EXHIBIT 6

o'neal.txt

```
        8     Q.   Can you please state your name for the record?
        9     A.   My name is Jonathan Juarez.
08:43  10     Q.   Is there a middle name?
       11     A.   Lee.
       12     Q.   And what is your business address?
       13     A.   I'm sorry, sir?
       14     Q.   What is your business --
08:43  15     A.   You cut out.  Sorry.
       16     Q.   Your business address?
       17     A.   1330 West Southern Avenue, Suite 301, Tempe,
       18 Arizona 85282.
       19     Q.   Have you been deposed before?
08:44  20     A.   Yes, sir.
       21     Q.   What type of cases?
       22     A.   I don't know how to answer that question.  I
       23 guess cases that are relevant to collections.
       24     Q.   Cases like this?
08:44  25     A.   Yes, sir.  One time.
```

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

5

```
        1     Q.   One time?
        2     A.   Yes, sir.
        3     Q.   So you understand the basic format.  I'm going to
        4 be asking questions under oath and hopefully you'll give
08:44   5 me your best answers.
        6     A.   I'll absolutely give my best answers, sir.
        7     Q.   Can you tell me what your current position with
        8 Allied is?
        9     A.   Yes, sir.  My current position is assistant
08:44  10 vice-president of client services.
```
                              Page 4

EXHIBIT 6

o'neal.txt

```
     11      Q.    How long have you had that position?

     12      A.    I've had this particular position in the range of

     13  two and a half years.

     14      Q.    Did you work for Allied in another position prior

08:45 15  to your current position?

     16      A.    Yes, sir.

     17      Q.    What position was that?

     18      A.    I was a global trainer.

     19      Q.    Let me just start your current job as assistant

08:45 20  vice-president of client services.  Can you describe for

     21  me what your day-to-day role is?

     22      A.    Generally, I manage the relationships between

     23  Iqor and our client, sir, whether it's reporting,

     24  analytical, account research.  All the way down to dealing

08:45 25  with general cases such as like, you know, consumer --
```

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

♀

6

```
      1  dealing with situations, assisting and being an advocate

      2  for that process.

      3      Q.    What is Iqor?

      4      A.    Iqor is the company I work for, sir.

08:46 5      Q.    And what's the relationship between Iqor and

      6  Allied?

      7      A.    Iqor is the parent company and Allied Interstate

      8  is a sub-company to Iqor.

      9      Q.    So you don't actually work directly for Allied.

08:46 10  You work only for Iqor?

     11      A.    I work for Iqor, sir.  That is correct.

     12      Q.    How about your job as global trainer, was that

     13  also for Iqor?
```

Page 5

EXHIBIT 6

o'neal.txt

14      A.    That is correct, sir.

08:46 15      Q.    Can you describe for me your day-to-day

16  responsibilities or duties as a global trainer with Iqor?

17      A.    Just manage, develop training material and then

18  obviously train the agents, new hires about the company

19  and the product, the environment that they're going into.

08:47 20      Q.    Can you describe for me the trainer material that

21  you developed?

22      A.    Sir, it's so long ago that I don't even recall

23  exactly what I developed.  Obviously, it's changed

24  overtime, sir.

08:47 25      Q.    Do you know what the topic or subject matter of

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

7

1  the training material was?

2      A.    Yeah.  Absolutely.  We train to the Fair Debt

3  Collections Practices Act and the Telephone Consumer

4  Protection Act and then other relevant information about

08:47 5  our business.

6      Q.    You are familiar with the Fair Debt Collections

7  Practices  Act and the Telephone Consumer Protection Act?

8      A.    I am sir, yes.

9      Q.    What is your education?

08:47 10      A.    Graduated college, sir.  I'm not sure what you

11  mean by that.

12      Q.    What school with what degree?

13      A.    I graduated from massage therapy at caring ton

14  college, sir.

08:48 15      Q.    You have a degree in massage therapy?

16      A.    I have a license in massage therapy, sir.

Page 6

EXHIBIT 6

o'neal.txt

17    Q.   What training, if any, have you taken with

18  respect to your current job duties working at Iqor and

19  Allied?

08:48 20    A.   Well, during that particular stint with caring

21  ton, we also went through business, master business.  Just

22  learned basic information about that.  If you're asking if

23  I know relevant information to this specific job that I'm

24  working in now, I went through the ACA certification, sir,

08:48 25  and I am ACA certified.

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

8

1    Q.   When did you complete ACA certification?

2    A.   I want to say a year and a half ago, sir, but I

3  don't know the exact date.

4    Q.   And you're here today as a designated

08:49 5  representative to give testimony in regards to the O'Neal

6  case?

7    A.   That's what it appears to be, sir.

8    Q.   Are you familiar with the claim that's been filed

9  by Sandra O'Neal in the Middle District of Tampa?

08:49 10    A.   I'm familiar with the complaint from Sandra

11  O'Neal, yes, sir.  I'm not sure who you're talking about

12  on the back end of that.

13    Q.   Back end of what?

14    A.   You said Sandra O'Neal and somebody else.  I'm

08:49 15  aware of Sandra O'Neal's complaint.

16    Q.   Okay.  You actually read the complaint?

17    A.   Yes, sir.

18    MR. GADD:  Madam court reporter, do you have a

19  copy of the complaint that we sent over to you in this

Page 7

EXHIBIT 6

o'neal.txt

08:49 20    case?

21          THE COURT REPORTER:  Yes.

22          MR. GADD:  I would like you to show that to the

23    witness.  It is my intention to have it marked as

24    plaintiffs Exhibit No. 1.

12:36 25          (Deposition Exhibit Number 1 was marked for

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

9

1          identification.)

2    BY MR. GADD:

3          Q.   Mr. Juarez, when you had an opportunity to look

4    at that, just let me know, okay?

08:50 5          A.   Okay.  One moment.  All right (indicating).

6          Q.   Okay.  Is this the first time you've seen this

7    complaint?

8          A.   No.  I've seen this before, sir.

9          Q.   What I would like to do is I would like to go

08:51 10   through this complaint with you and I hope to get a better

11    understanding of what facts you admit to and what facts

12    you do not.  That would be the same as your affirmative

13    defenses.

14          Let me turn your attention to paragraph No. 8 on

08:51 15   page 2 of the complaint.

16          A.   Okay.  Where it says plaintiffs issued cease and

17    desist instructions to defendant on or about November 20th

18    of 2013?

19          Q.   Correct.

08:52 20         A.   I see that, sir.

21          Q.   Is that something that admit to by your company

22    or sit denied?

Page 8

EXHIBIT 6

o'neal.txt

23      A.   I want to better understand your question, sir.

24   Can you be a little more specific to what you're asking me

08:52 25   to confirm or deny?


                UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

                                                          10


1      Q.   Sure.  Plaintiff alleges to have issued a cease

2   and desist letter to your company on November 20, 2013.

3   Is that something you admit to or something you deny?

4      A.   We did receive a notification from the plaintiff,

08:52 5   sir.

6      Q.   What was the date of that notification?

7      A.   I'm sorry?  You're cutting in and out.

8      Q.   What was the nature of the notification?

9      A.   To my understanding, it's a cease and desist

08:52 10   letter, sir.

11      Q.   Who received it?

12      A.   Allied Interstate.

13      Q.   On what date?

14      A.   I couldn't confirm the actual date that we

08:53 15   received it, but I know in the system once we receive it,

16   our system we seize the account out of it.  So I'm showing

17   that the date we seized the account out of our office was

18   on 12-11 of 2013, sir.

19          So it was on or about that timeframe when we

08:53 20   received it and the plaintiff stating they sent it on

21   November 20th.

22      Q.   How many cease and desist instructions did your

23   company receive from the plaintiff in this case?

24      A.   We received one notification in regards to this,

08:53 25   and that was the date we received it and we seized the
                                Page 9

EXHIBIT 6

o'neal.txt

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

11

1    account as well.

2         Q.    Had your company contacted the plaintiff in this

3    case prior to 12-11-2013?

4         A.    Yes, sir.  We made contact with your plaintiff

08:54  5    two times, sir.

6         Q.    Two times when?

7         A.    One time in July and then one time in October.

8         Q.    What was the nature of those communications?

9         A.    Good question.  So the first one was -- we spoke

08:54 10    with Sandra O'Neal.  She said she wouldn't pay it at the

11    moment.  Obviously, it was her.  She confirmed her name,

12    information.  She was actually rather pleasant on that

13    call.  She said she couldn't afford to pay it at that

14    point in time.

08:55 15         And that was pretty much the end of it, or she

16    said she couldn't pay it and within two weeks to work with

17    her, in that range of statement.

18         Q.    What date was that call?

19         A.    I want to say it was on July 11.  That may be the

08:55 20    actual date.  I'm thinking somewhere in that range, as I

21    don't recall the actual date.

22         Q.    July 11, 2013?

23         A.    7-11-2013, sir.

24         Q.    And was there contact by the company after July

08:55 25    11, 2013?

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

12

EXHIBIT 6

o'neal.txt

```
    1      A.   Yes, sir.  That contact was made in October.
    2      Q.   Also 2013?
    3      A.   That is correct, sir.
    4      Q.   When you say your company, are you referring to
08:56 5  Iqor, is that correct?
    6      A.   Well, obviously it's the sub company, which would
    7  be Allied Interstate, who is trying to contact her.
    8      Q.   The reason I'm asking is because I've got a call
    9  log produced from Allied regarding O'Neal that shows a
08:56 10  total of 178 phone calls from 7-15-2013 through 12-2-2013.
   11      A.   Right.
   12           MR. BRODERICK:  Did you want to mark the call log
   13  as an exhibit?
   14           MR. GADD:  Not yet, but we'll get to that point.
08:56 15  BY MR. GADD:
   16      Q.   You told me there's been two sets of contacts.
   17  The in excess of 178 points of contact or attempt to
   18  contacts with Ms. O'Neal.  That's a lot different than
   19  two, as I understand it.  So I want to make sure I'm clear
08:56 20  on what it is you're telling me.
   21           MR. BRODERICK:  I object to the fact that you're
   22  asking the witness to guess and you're reading from a
   23  document that you're not willing to show him in the
   24  deposition.
08:57 25           Over that objection, he can answer my question.
```

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

13

```
    1           THE WITNESS:  I'm not in the business of
    2  calculating how many contacts are made and attempts are
```

EXHIBIT 6

o'neal.txt

3  made.  If we made a contact it's documented in the system.

4  And I seen the two documentation where we contacted her.

08:57  5  BY MR. GADD:

6      Q.   Since we're looking at call logs right now, I

7  would like to have the call logs marked as Exhibit No. 2 I

8  would like to have you take a look at those.

9           (Deposition Exhibit Number 2 was marked for

08:57 10          identification.)

11          THE WITNESS:  Looks like it was 179 attempts,

12  sir.

13  BY MR. GADD:

14      Q.   What is it you're looking at, sir?

08:58 15      A.   Your call log.  The call log you have in front of

16  you as well.

17          MR. BRODERICK:  It's a two-page document.

18          THE WITNESS:  Two-page document Allied O'Neal

19  00000 one.

08:58 20  BY MR. GADD:

21      Q.   Is that the document produced by Allied?

22      A.   That is correct, sir.

23      Q.   Where is the information contained in this

24  document?  Where is it sourced from?

08:58 25      A.   I believe this is sourced -- basically the

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

14

1  system.  So any time a contact or an attempt to contact is

2  made based on the results of that call, it stamps in the

3  system and then IT or somebody would have to go and

4  extract that data from the system.

08:58  5      Q.   Who extracted the data from the IT system to

EXHIBIT 6

o'neal.txt

6  which your referring to produced in this call log?

7      A.   I honestly don't know, sir.   I didn't prepare

8  the documents.   I just have them provided to me by the

9  counsel.

08:58 10    Q.   Would it be fair to say that you do not know who

11  produced the information contained in this material?

12      A.   Well, I'm pretty certain that our counsel

13  received this information from our IT department, sir.

14      Q.   But I'm asking you.   You don't know who that

08:59 15  person would be, correct?

16      A.   Just our IT department.

17      Q.   Who in IT?

18      A.   There's a bunch of individuals in our IT

19  department that do a bench of different things.

08:59 20    Q.   Have you spoken to anyone in the IT department

21  regarding this case?

22      A.   No, sir.   I allowed our counsel to do that.

23      Q.   Have you spoken with anybody in the IT department

24  regarding call logs that you're referring to as Exhibit 2?

08:59 25    A.   Can you repeat that?   You cut out.

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

15

1      Q.   Have you spoken to anyone in the IT department

2  regarding the call logs in Exhibit 2?

3      A.   No, sir.

4      Q.   Where would you go if you wanted to verify

08:59 5  contents of the information itself, where would you go,

6  who would you speak to?

7      A.   All I would need to do is look at the system, the

8  account itself.   There's a difference:   So the information

Page 13

EXHIBIT 6

o'neal.txt

9    is accessible through me through the system.  If you want

09:00  10  to extract the data you got to get to IT to extract that

11   data.  So I have access to it.

12          I can view it in the system.  I just can't

13   extract the data.

14     Q.   What system are you referring to?

09:00  15     A.   It's known as FACS, F-A-C-S.

16     Q.   What does that stand for?

17     A.   I don't know, sir.

18     Q.   What does it do?

19     A.   It manages consumer accounts.  It's our account

09:00  20  management system.

21     Q.   How does that work with the telephone system?

22     A.   I'm not a code writer, but hypothetically it

23   should communicate with our call bar.  It's basically our

24   cell phone.  And anything that happens with call bar it

09:01  25  communicates it directly with FACS.  Obviously there's

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

16

1    some sort of bridge in there to make them communicate with

2    each other.

3          Any time anything is input into the call bar, it

4    reflects that information immediately in FACS.

09:01   5     Q.   What is a call bar?  I'm not familiar with that

6    terminology.

7     A.   It's a soft phone, sir.

8     Q.   What does that mean?

9     A.   How can I explain?  It's a phone that's on a

09:01  10  computer versus a hard phone that's on a desk not cell

11   phone up there it's soft phone.

Page 14

EXHIBIT 6

o'neal.txt

```
     12     Q.    You mentioned that you were involved as a

     13   trainer.  I took that to mean that you were active in

     14   training to folks that actually do the collection calls?

09:01 15     A.    That is correct, sir.

     16     Q.    Working as a global trainer or trying to teach

     17   individuals how to place phone calls, what is the

     18   methodology you use?

     19     A.    Anything we teach is within the Fair Debt

09:02 20   Collection Practices Act and the Telephone Consumer

     21   Protection Act, sir.

     22     Q.    What would those boundaries be, as you understand

     23   them?

     24     A.    There's a whole lot of boundaries.  I want you to

09:02 25   be specific to what you're asking to.
```

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

17

```
      1     Q.    I want to know what it is you teach those who

      2   later become debt collectors?

      3     A.    The FDCPA and TCPA.

      4     Q.    What do you teach in terms of making telephone

09:02 5   calls?

      6     A.    Obviously, that needs to be a manual process,

      7   sir.

      8     Q.    How is your prospect manual if you're told me

      9   your telephone through a computer?

09:02 10    A.    Basically it's a preview system.  What happens is

     11   during that timeframe, the consumer's information will pop

     12   up on the screen.  It will have a little button for the

     13   agent to click to dial and they manual click this button

     14   to dial out that information.
```

Page 15

EXHIBIT 6

o'neal.txt

09:03 15          What it does at that point, it makes the call and

16    the agent pulls up the account and begins the call.  So

17    it's a manual process.

18        Q.    The agent collision a name, correct?

19        A.    No, sir.  The agent collision on a term that says

09:03 20    click here to dial call.

21        Q.    Okay.  So what happens when the agent hits the

22    collision button?

23        A.    You cut out at the end.  Can you repeat that?

24        Q.    What happens with the agent with the click here

09:03 25    button?

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

18

1        A.    It dials the call.

2        Q.    What dials the call?

3        A.    The system does.

4        Q.    By the system, you mean the account management --

09:03  5        A.    No.  The soft phone, sir.

6        Q.    What is the name of that system?

7        A.    I advised you it's called call bar, sir.

8        Q.    Who produces it?

9        A.    What do you mean by produce?  Who designed and

09:04 10    created it.

11        Q.    Yeah.

12        A.    It's Iqor system, sir.

13        Q.    It's in-house?

14        A.    I don't know who developed it or who designed it.

09:04 15    I just know it's a system we use.  I don't know who owns

16    it.

17        Q.    With respect to the calls in this particular

EXHIBIT 6

o'neal.txt

18  case, I'm referring to the call log which should be

19  Exhibit No. 2, where do these calls originate from?

09:04 20      A.   Where did these calls originate from?

21      Q.   Yes, sir.

22      A.   What do you mean by that, sir?

23      Q.   Well, these calls had to come from somewhere,

24  correct?

09:04 25      A.   Where our agent is sitting and taking the call.


UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

19


1      Q.   Correct.

2      A.   Right.  That's where the calls are coming from.

3      Q.   Where would that be in this case?

4      A.   In this case, it was most likely in Phoenix or

09:05 5  Tempe, Arizona.

6      Q.   How can you tell that?

7      A.   Because that particular department only operated

8  in Phoenix, Arizona at that time.

9      Q.   What particular department are we referring to?

09:05 10      A.   I'm sorry?

11      Q.   What particular department are we referring to?

12      A.   The Sprint department, sir.

13      Q.   Did you personally overhear any of these calls

14  that were initiated to Ms. O'Neal?

09:05 15      A.   Yes, sir.  I heard the two contacts that we made

16  with her.

17      Q.   At the time the contact was made or afterwards?

18      A.   Afterwards, sir.  I mean, 2013 was -- I wasn't

19  there at that time, but obviously once I knew I needed to

09:06 20  deal with this case, I made sure I listened to that

Page 17

EXHIBIT 6

o'neal.txt

21    information.

22        Q.    You never met Ms. O'Neal, correct?

23        A.    No.

24        Q.    How does your phone call recorded?

09:06 25        A.    Our internal system is called catch.  And it

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

20

1    catches the calls and records them.  I don't know how it

2    works, but it catches every single call, 100 percent of

3    them.

4        Q.    Is it also hooked to your telephones?

09:06 5        A.    Recording what is happening on the telephone.  I

6    can hear it.  It's hooked to the telephones.

7        Q.    Is it also hooked to a computer?

8        A.    Yes, sir.

9        Q.    What type of telephone was used to make these

09:07 10    calls?

11        A.    Again, a soft phone.

12        Q.    Do you know who makes the phone?

13        A.    Again, I don't know who makes the phone, sir.

14        Q.    Who would you go to within your company to find

09:07 15    out which model or manufacturer of phone is being used to

16    make the call at this time?

17        A.    You have to go IT on that, sir.

18        Q.    What person would you go to at IT to get that

19    information?

09:07 20        A.    I open a ticket and somebody in IT deals with it.

21    It's not a direct person.

22        Q.    It's my understanding that your company was

23    trying to collect a debt allegedly owed to Sprint by the

EXHIBIT 6

o'neal.txt
24   plaintiff.  Is that also your understanding?

09:08 25      A.   My understanding is that that is what we were

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

21

1   trying to do, sir.

2      Q.   When did your company obtain the account with

3   Sprint?

4      A.   That's a good question.  I know it was prior to

09:08  5   July and in that timeframe of 2013, I can't recall the

6   exact date, sir, to be honest with you.

7      Q.   Where would you go to obtain that information

8   regarding the date your company received the account from

9   Sprint?

09:08 10      A.   That would be FACS.

11      Q.   So that you believe that information is

12   available?

13      A.   Yeah.  Absolutely.  You know, sometimes you

14   remember things and sometimes you don't.  In this case I

09:09 15   don't recall the actual date and I wouldn't want --

16      Q.   I guess that brings me to a good question:  What

17   did you do today, what documents did you look at to

18   prepare for your testimony?

19      A.   I looked at the account through FACS.  I

09:09 20   obviously looked at the complaints and all these

21   documents.  But again, there's so much to remember, you

22   can't remember everything.

23          I'm sure my counsel has that information as well.

24          MR. BRODERICK:  We'll provide the date when

09:09 25   Mr. Juarez has to chance to look at the computer.

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT
Page 19

EXHIBIT 6

o'neal.txt

22

1  BY MR. GADD:

2      Q.   Okay.  Let me ask you:  How would the process

3  work within the confines of your company once an account

4  is received into the office?

09:09  5      A.   So you're asking when we get the account, what do

6  we do or how do we receive the account?  Which one?

7      Q.   Both.

8      A.   Okay.  So the client sends the file over.  We get

9  that information, our IT department uploads it into the

09:10 10  system.

11          Once it's uploaded into the system, then

12  obviously it generates a letter to the consumer to let

13  them know we're attempting to collect a debt.  And then

14  after a certain period of time, we start calling.

09:10 15      Q.   What is the period of time?

16      A.   I don't know, sir.

17      Q.   So in this particular case with Ms. O'Neal, what

18  documentation did you receive prior to initiating the

19  call?

09:10 20      A.   The account file, her Social Security number, her

21  name, her Sprint account number.

22      Q.   This information that you have in the confines of

23  your system?

24      A.   FACS, yes, sir.

09:10 25      Q.   You said the information is uploaded.  So when

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

23

1  you get the information from the underlying principal,

EXHIBIT 6

o'neal.txt

2   what is uploaded and how is it uploaded?

3       A.   I couldn't tell you because IT does that process.

4   I'm not an IT guy and I don't know how they upload it.

09:11 5   They work through that.

6           And then as far as information, pretty much all

7   the detail that would be needed to collect the debt.   So

8   her social, her birthday, first name, last name, the

9   balance that's due, the date.

09:11 10      Q.   It's uploaded in something referred to as a cue?

11      A.   I'm not understanding what you mean by that.

12      Q.   Well, when you get account information and it's

13  uploaded into one of your computers, correct?

14      A.   It gets uploaded to a FACS.

09:11 15      Q.   After facts it gets uploaded into a call bar?

16      A.   No.   That's different.   In that process -- I

17  don't know how the IT works it.   I couldn't tell you how

18  the coding does it.   Once the account is in the system,

19  they're connected, you know.   Call bar and FACS are the

09:12 20  same thing pretty much.   They're one and the same system.

21          I don't know what you're asking, but basically it

22  goes in there and then the system does it and then our

23  agents get the information.

24          Obviously, if it's a cell phone, they manually

09:12 25  dial that number.

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

24

1       Q.   I think you said earlier, they click on the

2   number, correct?

3       A.   No, sir.   I said there's a statement that says

4   would you like to dial this account or in that range of

Page 21

EXHIBIT 6

o'neal.txt

09:12  5    statements.  And then it says okay, click it, click to

    6    dial and it dials it out.

    7        Q.   What is it?

    8        A.   System.  Pop up.

    9        Q.   Then you said system.  What is the system you're

09:13 10    referring to?

   11        A.   Call bar and FACS, sir.

   12        Q.   And those are things that are hooked to a

   13    computer?

   14        A.   That is correct, sir.

09:13 15        Q.   Now, Allied does not own the debt in this case

   16    correct?

   17        A.   You are correct, sir.

   18        Q.   Can you tell me or explain to me what steps

   19    Allied took to verify the legitimacy of the debt owed by

09:13 20    Sprint against Ms. O'Neal?

   21        A.   Sprint sends the account to us.  Unless Ms.

   22    O'Neal tells us that's not her account or something like

   23    that, then obviously we assume that the client is

   24    providing us with valid detail.

09:13 25        Q.   Does your company make independent effort to

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

25

    1    determine whether or not the debt is valid prior to

    2    collection efforts?

    3        A.   I couldn't tell you that.  I don't know.  I do

    4    know we trust our client to provide us with the proper

09:14  5    detail.  If we do any additional research, I couldn't tell

    6    you.  That would be what I do.

    7        Q.   It would be noted somewhere in you would use

Page 22

EXHIBIT 6

o'neal.txt

8   systems such as FACS?

9      A.   Yes.  So it's going to be noted that's the

09:14 10 account that we need to collect on.

11      Q.   In this particular case do you have any records

12   in your possession or under your control or your company's

13   control that indicated that Allied took independent

14   investigation as to the validity of the debt?

09:14 15     A.   Well, I would like to clarify that.  At the

16   beginning when the account was first received by us, I

17   don't know.  But if she had provided us information that

18   the account wasn't hers, obviously we place it in a

19   certain status to review it, which we did speak with her

09:14 20 in October in reference to that.

21      Q.   Let me ask you again:  Do you have any records or

22   documents in your possession or control that would suggest

23   that your company investigated the legitimacy of the debt

24   prior to the call and campaign having begun?

09:15 25     A.   I don't know, sir.  I couldn't answer that

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

26

1   because I don't know.

2      Q.   Based upon the documentation that you reviewed in

3   preparation for your deposition today, are you aware of

4   any such documents?

09:15 5      A.   No, sir.

6      Q.   Other than your telephone system, are there any

7   other methods used by Allied to contact Ms. O'Neal?

8      A.   The only way we would try to contact her is

9   through our telephone system.  If you're asking if

09:16 10 somebody tried to call her from a cell phone or something,

EXHIBIT 6

o'neal.txt

11   I can tell you no because our system is the only way we

12   contact people.

13        Q.   I just want to make sure other than telephone is

14   there any other method your company used to contact Ms.

09:16 15   O'Neal?

16        A.   Right.  So then the next step -- if you're asking

17   in attempt to contact, we also send a letter.

18        Q.   Do you claim to have sent a letter in this

19   particular case to Ms. O'Neal?

09:16 20        A.   I didn't send the letter, but we have.

21        Q.   who is we?

22        A.   Allied Interstate, Iqor.

23        Q.   Okay.  Who sent the letter?

24        A.   I'm sorry?

09:16 25        Q.   Who sent the letter?

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

27

1        A.   Allied Interstate and Iqor.

2        Q.   I'm assuming you are claiming that someone from

3   Allied or Iqor sent a letter to my client, right?

4        A.   Well, we send a letter when the account gets in

09:17 5   our office.  Based on the address we have on file, we sent

6   a letter.

7        Q.   I'm asking who is that person at your company who

8   would have been responsible for sending that letter?

9        A.   I don't know.

09:17 10        Q.   Did you make any effort to find out prior to

11   today's deposition?

12        A.   No, sir, because obviously -- who is going to ask

13   who sent the letter.  Our company sends it.  There's

Page 24

EXHIBIT 6

o'neal.txt

14   probably three or four people that send the letter, you

09:17 15   know, that deal with that process of sending letters.  I

16   don't know who it is, nor would I even think of hey, who

17   sends this letter.

18          I wouldn't think of even asking that question.

19     Q.   How many people are employed at your Phoenix,

09:17 20   Arizona location?

21     A.   Well, you're asking about the entire site.

22   There's about 800 people that are employed at that site

23   right now.

24     Q.   Do you have access to those employees if you

09:18 25   wanted to ask these questions, do you have access to them?

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

28

1     A.   I mean, I would have to reach out to our

2   lettering team.  But our counsel could obviously do that

3   as well.

4     Q.   What is your proof that Ms. O'Neal received a

09:18 5   letter?

6     A.   Can you repeat that?  I didn't catch the first

7   part of what you said.

8     Q.   What is your proof for your company or evidence

9   that Ms. O'Neal received the letter?

09:18 10     A.   Sprint provided us with the address, the service

11   address.  So when we send that letter to the service

12   address, we're assuming that's the right address we're

13   sending it to.

14     Q.   Did you send it certified mail?

09:18 15     A.   No, sir.

16     Q.   How was it sent?  What method?

EXHIBIT 6

o'neal.txt

17      A.    Standard mail.

18      Q.    Have you seen a copy of outgoing envelope?

19      A.    No, sir.  I haven't seen a copy of the outgoing

09:19 20    envelope.

21      Q.    So would it be fair to say that you don't have

22    any firsthand knowledge of that letter being sent?

23      A.    Well, I mean if we request it from our IT

24    department, they provide that information and we have that

09:19 25    knowledge.  It's available.

                UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

                                                          29

1      Q.    But you didn't, correct?

2      A.    Our counsel has that information.

3      Q.    Do you know that to be a fact?  Have you spoken

4    to somebody who has done that?

09:19 5      A.    In reference to the lettering itself?

6      Q.    Correct.

7      A.    I mean, all I know is it's in the system when we

8    first place the account in our office we send a letter

9    out.

09:19 10     Q.    How do you know that?

11      A.    Because I can go into the system and see.  It

12    will say a specific code and what kind of letter was sent.

13    It will have 5'8" two and it will say "Letter sent."

14      Q.    Let me ask you this way:  You didn't receive a

09:20 15    letter saying it was sent correct?

16      A.    Repeat that.

17      Q.    You didn't see the letter get sent in the mail,

18    correct?

19      A.    No.

                          Page 26

EXHIBIT 6

o'neal.txt

09:20 20    Q.   And you didn't speak to anyone who claims to have

21   sent this letter?

22    A.   No, sir, but it's in our system so that means the

23   letter was sent.

24    Q.   That's not something you have firsthand knowledge

09:20 25   of?  Your testimony is simply limited to the documentation

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

30

1   you received; is that a fair statement?

2        MR. BRODERICK:  Object to the form.  I think he

3   answered.

4        You can answer again.

09:20 5        THE WITNESS:  I would like you to repeat the

6   question because I don't understand what you said.

7        MR. GADD:  I'll ask the court reporter to read it

8   back.

9        (Requested portion read by the reporter.)

09:21 10        MR. BRODERICK:  Same objection.  You can answer.

11        THE WITNESS:  It's limited to what I see in our

12   system.

13   BY MR. GADD:

14    Q.   How many phone calls does Allied make on any day

09:21 15   for debt collection purposes?

16    A.   There's no way for me to tell that, sir.  I

17   couldn't tell you.  I don't know.  That's beyond the

18   boundaries of what I look at.

19    Q.   What do you look at?

09:21 20    A.   My job.  Doing client services, sir.

21    Q.   In light of your job and your position, you don't

22   have any idea as to proximate number of outbound calls

Page 27

EXHIBIT 6

o'neal.txt

23  Allied makes in a given day?

24      A.   I wouldn't even want to tell you because I don't

09:22 25  know.

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

31

1       Q.   Do you know with respect to calls made from the

2   Phoenix, Arizona facility?

3       A.   Still, again, that varies and days change and I

4   don't know exactly what it would be, sir.

09:22 5     Q.   Is that something you can estimate?

6       A.   I would not estimate that, sir.

7       Q.   Where would you go to find out?

8       A.   We would probably have to request that from IT.

9       Q.   Are you aware that Ms. O'Neal claims that she did

09:22 10  not have a Sprint account?

11      A.   Yeah.  I'm aware she claimed that on the second

12  communication we had with her.

13      Q.   What would be the date of that second

14  communication?

09:23 15    A.   On or around October 13 of 2013, in that range.

16  Again, that particular day is a little cloudy but I think

17  it's the 13th, I want to say.

18      Q.   What response or action did Allied take with

19  respect to the information that Ms. O'Neal provided of not

09:23 20  having this account?

21      A.   She provided the information.  We updated the

22  status as fraud, which is what she was claiming.  She said

23  she never had a Sprint account on the second contact.

24  First contact was a little bit different.

09:23 25          Second contact she said that.  So our agent went
                          Page 28

EXHIBIT 6

o'neal.txt

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

♀

32

1   in and updated the status to fraud.  Then what we do is

2   there's a back end process.  She was advised to contact

3   Sprint and also notify them because Sprint would obviously

4   update us if they had the information.

09:24   5           Obviously, she would need to file a police report

6   and do that kind of stuff and then provide that out to

7   Sprint and call them and deal with them in regards to it.

8   If she would have done that, Sprint would have notified us

9   and we would have updated our status.

09:24  10           Sprint did their research or they waited their

11   time period and then after that time period they resumed

12   collection activity.

13       Q.   Sprint would be your client, correct?

14       A.   That is correct, sir.

09:24  15       Q.   I'm asking what did you do, what did your company

16   do with Ms. O'Neal advised she did not have a Sprint

17   account?  What action did they take?

18       A.   Once we put it in the fraud status our back

19   office team goes in and they do the review for that -- to

09:24  20   be honest with you, I don't work in that department, so I

21   wouldn't know exactly what they did or reviewed.

22           But they do a process to determine and they wait

23   for a time period that I don't actually know the exact

24   time on that.

09:25  25           And then if that information or whatever research

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

♀

33

EXHIBIT 6

o'neal.txt

```
        1   they did, if it came back that it is not a fraud case,
        2   then, in that sense, they'll kick it back to Sprint and
        3   decisions will be made from there.
        4           I don't know how it's done.
09:25   5       Q.   Are you referring to what you think or
        6   hypothetically they placed or are you referring to
        7   something you know took place in this case?
        8       A.   I'm referring to the process that the been with
        9   the company that I am aware of.
09:25  10       Q.   So you're not referring to what took place in
       11   this particular case, you're referring to the process that
       12   you believe may have taken place?
       13           MR. BRODERICK:  Objection to the form.
       14           You can answer.
09:25  15           THE WITNESS:  It's the process.  That's all I
       16   know.
       17   BY MR. GADD:
       18       Q.   I don't know what you mean by that, sir.  So I
       19   need to ask you to please clarify?
09:26  20       A.   I would clarify if I knew what they actually did,
       21   but I don't know what they do when they get that account
       22   in their fraud bucket.  They do their research.
       23       Q.   If, in fact, they did anything, would that not be
       24   noted somewhere in your files?
09:26  25       A.   Yeah.  Definitely would be noted in our FACS
```

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

34

```
        1   system.
        2       Q.   Okay.  You told me you reviewed this FACS system
```

EXHIBIT 6

o'neal.txt

3   prior to your testimony today, correct?

4        A.   That is correct, sir.

09:26  5        Q.   In your review of the FACS documentation and also

6   in preparation for your deposition today, did you become

7   aware or see any documents which would indicate a process

8   to which you were referring was followed with respect to

9   Ms. O'Neal?

09:27 10        A.   Yes.  When we put the account in fraud status,

11   sir.

12        Q.   Was that it?

13        A.   That's what tells us the process is being

14   started.

09:27 15        Q.   Do you have any documentation, account notes of

16   any kind that would suggest that Allied reached out to

17   Sprint to investigate this matter?

18        A.   All I see is the account went into a fraud status

19   and they deal with that from there.

09:27 20        Q.   Do you have any factual information that anyone

21   from Allied or Iqor reached out and actually contacted

22   Sprint to investigate this matter?

23        A.   I'm sure we do, but I don't have it.  I do -- the

24   only thing I know is any time we do a fraud status, it

09:27 25   shows up on the account.  That's what we put it in and

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

35

1   that's how I have knowledge of it.

2        Q.   How are you sure that took place if you don't

3   have evidence of it?

4        A.   Because that's the process, sir.

09:28  5        Q.   But the process you described to me would leave

Page 31

EXHIBIT 6

o'neal.txt

6  behind a paper trail of you guys reaching out to Sprint in

7  regards to this matter, correct?

8      A.  It does.  It says we put it in fraud, sir.

9      Q.  What does Sprint send back to you as a code, a

09:28 10  trail with a one code after that?

11      A.  I don't have the back office deals with that,

12  sir.  It could be a file exchange where we send a file --

13  all the files that are in a fraud status to Sprint.

14  Sprint takes that information and reviews them and sends

09:28 15  us back a file with the accounts that they deemed not to

16  be fraud.

17      Q.  Can you tell me what information you're saying

18  you sent to Sprint in this particular case?

19      A.  I couldn't tell you, sir.  I don't know.

09:28 20  Q.  Why not?

21      A.  Because I'm not a part of that process.  If it's

22  a file or something like that, our IT department would

23  deal with that, sir.

24      Q.  If your IT department did deal with that, where

09:29 25  would those notes be?

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

36

1      A.  They would have different information.  It would

2  probably be in one of the file exchanges.

3      Q.  Is that information you have access to?

4      A.  No.  I wouldn't even know how to read that stuff.

09:29 5  It's all code encrypted and things like that.

6      Q.  What happened next with respect to your campaign

7  and Ms. O'Neal?  How do you claim the account was marked

8  as fraud?

Page 32

EXHIBIT 6

o'neal.txt

        9    A.    You're asking how do we claim we marked the
09:29  10   account as fraud?

       11    Q.    No.  I'm asking what was your next step?

       12    A.    After they did their review and information, and
       13   it's deemed this account was not fraud, Sandra failed to
       14   follow-up with Sprint and notify them as well.  Then at
09:30  15   that point in time, the account would obviously open back
       16   up into a collection status if it's been deemed that the
       17   account is not fraud.

       18    Q.    How do you know what Sandra O'Neal did or didn't
       19   do?

09:30  20    A.    Because if she talked to Sprint, Sprint would
       21   have documentation in their system.

       22    Q.    You have not spoken to Sprint correct?

       23    A.    Well, sir, I communicate with Sprint every day.
       24   I have access to their direct system.

09:30  25    Q.    Do you have any point in time did you ever pick

            UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

                                                            37


        1   up the phone, call Sprint or send Sprint a letter asking
        2   them to investigate it and get a response back from Sprint
        3   with regards to Ms. O'Neal claiming it as fraud?

        4         MR. BRODERICK:  Objection to the question.
09:30   5         THE WITNESS:  I don't need to do that.  I can go
        6   into their system.  If she called in, they make notations.
        7   BY MR. GADD:

        8    Q.    Okay.  If that's the case, what was Sprint's
        9   response?

09:31  10    A.    I didn't see a response, sir.

       11    Q.    You didn't receive a response from Sprint?

                          Page 33

EXHIBIT 6

o'neal.txt

12      A.   Didn't see anything in reference to that, sir,

13   no.

14      Q.   Did you find that to be peculiar?

09:31 15      A.   Sorry?  Did you find that to be peculiar.

16           MR. BRODERICK:  Objection to the form.  You can

17   answer.

18           THE WITNESS:  I don't know what you mean by that,

19   sir.

09:31 20   BY MR. GADD:

21      Q.   You've given me a lot of information today about

22   what you refer to as a process and apparently you have a

23   lot of faith in this process.

24           I'm asking you if, in fact, you provided certain

09:31 25   information saying that there was a concern of fraud with

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

38

1   respect to this particular case, do you not find it odd

2   that Sprint never replied back to you and took a position

3   one way or another?

4           MR. BRODERICK:  I think Mr. Juarez's earlier

09:31 5   testimony was in relation to whether or not Ms. O'Neal

6   contacted Sprint.  With that qualification --

7           MR. GADD:  We went into all that.  After that, I

8   said I want to know what your company did.  Not what Ms.

9   O'Neal didn't do.  What your company did.

09:32 10           THE WITNESS:  We put the account into a fraud

11   status, sir.

12   BY MR. GADD:

13      Q.   Is that information is conveyed to Sprint,

14   correct?

Page 34

EXHIBIT 6

o'neal.txt

09:32 15      A.   Sir, that's conveyed to them in a file process.

      16   That's totally different.  If Ms. O'Neal makes a contact,

      17   dials the 1(800) number for Sprint and talks to a Sprint

      18   representative, they will leave notations on the account.

      19        If we contact them in reference to fraud, that's

09:32 20   all back office.  We're communicating to them with files.

      21   It's a -- you're combining two different scenarios here.

      22   That's not the case.

      23        You're talking about two different things.  If

      24   Sandra O'Neal called Sprint directly, they will leave

09:32 25   notations.  On our end it's a totally different process.

              UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

                                                          39

       1   We'll put it in fraud.  We'll communicate with them with a

       2   file and then everything else goes from there.  IT deals

       3   with that.

       4   BY MR. GADD:

09:33  5      Q.   I'm aware of that.  What I'm asking about is, you

       6   communicated to Sprint that this file, this allegation or

       7   concern that fraud was -- you communicated that to Sprint

       8   by methodology, right?

       9      A.   Right.

09:33 10      Q.   Did Sprint get back in touch with your office one

      11   way or the other?

      12      A.   I don't know, sir.  Like I said, if they send --

      13   if we send a fraud file over to them, they do their

      14   research and they send a file back on what accounts are

09:33 15   fraud or not.  That's it.

      16        There's nothing more to it than that.

      17      Q.   I understand that, but I'm asking you in this

                              Page 35

EXHIBIT 6

o'neal.txt

18   particular case, did Sprint ever get back with you with a

19   response as far as Ms. O'Neal?

09:33 20        A.   Again, you would have to check with IT and find

21   out how the file process works and which file that

22   response was in.

23        Q.   In preparation for your deposition today, have

24   you seen any documentation that would suggest that Sprint

09:33 25   got back with Allied or Iqor with regards to the fraud

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

40

1   notation on the account?

2        A.   Again, I couldn't tell you that because if it's

3   in a file that I cannot see, I'm not going to answer a

4   question that I don't know.

09:34 5        Q.   Did you answer?

6             MR. BRODERICK:   I couldn't hear.   What was the

7   question?

8             THE WITNESS:   He said if I answered.   He couldn't

9   hear me.

09:35 10   BY MR. GADD:

11        Q.   My question subject to that is, you would know

12   what documentation you've seen, what documentation you

13   wouldn't have seen, correct?

14        A.   So, what I would know was what I see in FACS.   I

09:35 15   would not know what's in a file exchange between two IT

16   departments because I'm not that technical.   I don't know

17   that stuff.

18        Q.   That's fine.   Have you seen such documentation or

19   have you not?

09:35 20        A.   Again, if it was in the file, I wouldn't be able

EXHIBIT 6

o'neal.txt
21    to see it and I'm sure it's in the file exchange between
22    Iqor and Sprint at that time frame.  That's just the way
23    it works.
24        Q.   You're sure it was in the file?
09:36 25      A.   I don't know what it would look like in the file,

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

41

 1    sir.
 2        Q.   But you haven't seen it?
 3        A.   If the process was taken, which the account was
 4    placed in fraud, that means it triggers into a fraud
09:36 5    status and IT does their process at that point to
 6    determine whether it was a fraud case or not, sir.
 7             Again, if I saw the file and it had her
 8    information in it, I wouldn't even know how to read it
 9    because it's encrypted, sir.
09:36 10      Q.   Okay.  So my only problem with that, you have not
11    seen that file, correct?
12        A.   I know it's in the file because when we put the
13    account in fraud status, sir.
14        Q.   You know what is in the file?
09:36 15      A.   Sandra O'Neal's account was in that fraud packet
16    there because we put the account in a fraud status, sir.
17        Q.   But you don't know if there's any communication
18    back from Sprint with regards to the fraud status,
19    correct?
09:37 20      A.   Again, there's a process to that that our IT team
21    goes through.
22        Q.   I'm asking what you have personally have
23    knowledge of.

Page 37

EXHIBIT 6

o'neal.txt

24       A.   I personally have knowledge that the account

09:37 25   shows as fraud status, sir.

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

42

1       Q.   That's it, right?

2       A.   That's my knowledge, sir.

3       Q.   Did you say that's your knowledge or not to your

4   knowledge?

09:37 5   A.   That is to my knowledge, sir.

6       Q.   What is Allied policies in regards to cease and

7   desist instructions?

8       A.   Once we receive that information or cease and

9   desist letter or any type of term saying hey, don't bother

09:38 10   me ever again or anything like that we automatic seize the

11   account and we stop contact.

12       Q.   Is that a written policy?

13       A.   Yeah.  It's part of the policy, if we receive

14   cease and desist notification we need to seize the

09:38 15   account.

16       Q.   In your role, did Ms. O'Neal claim that she did

17   tell Allied to stop calling her?

18       A.   I'm aware she sent us a letter telling us to stop

19   contacting her.

09:38 20   Q.   Does your company honor cease and desist

21   instructions?

22       A.   Absolutely.

23       Q.   Did your company continue to call Ms. O'Neal

24   after the fraud notation, which I think you said was

09:39 25   10-13-2013?

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT
Page 38

EXHIBIT 6

o'neal.txt

43

1    A.   In that range, sir.  After it was determined that
2  the account was not fraud, we resumed collection activity,
3  sir.
4    Q.   Who determined it was not fruad?
09:39 5    A.   Again, that's a process in the IT department,
6  sir.
7    Q.   I want you to tell me what factual information
8  you are relying upon you tell me that you termed it was
9  not fraud?
09:40 10   A.   The system shows it was FACS.  Our IT department
11  does the communication and I could not tell you what
12  documents we receive or not, if it's a file or if it's at
13  exchange or how it exactly works, but we receive that
14  information and we resume collection activity, sir.
09:40 15   Q.   Did Allied request any billing information from
16  Sprint to Ms. O'Neal?
17   A.   Can you repeat that?  You cut out in the middle.
18   Q.   Did Allied ever request any billing information
19  from Sprint to Ms. O'Neal?
09:40 20   A.   We have access to the information.  So you're
21  asking if Allied ever requested Sprint to send Ms. O'Neal
22  willing information?
23   Q.   Correct.
24   A.   So as far as that goes, if she claimed dispute,
09:40 25  if she said dispute, then what we would do is we would

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

44

1  send out debt validation to Ms. O'Neal providing the
Page 39

EXHIBIT 6

o'neal.txt

2  underlying facts.  Ms. O'Neal stated fraud so they went

3  through the process of determining whether or not it was

4  fraud or not.

09:41  5      If Ms. O'Neal specifically requested the

6  documents, then we would have specifically requested those

7  documents from Sprint and provided that information out to

8  Ms. O'Neal.

9      Q.   The part I'm confused about is this:  You have

09:41 10  not spoken to anyone from Sprint about the allegation of

11  fraud involving Ms. O'Neal, correct?

12      A.   Repeat that question, sir.

13      Q.   You have not spoken to anyone from Sprint about

14  the allegation of fraud raised with Ms. O'Neal, right?

09:41 15      A.   Me personally, no, sir.

16      Q.   And Sprint did not provide you subsequent to the

17  fraud marked on the account, Sprint did not provide you,

18  as far as you know, documentation evidencing Ms. O'Neal is

19  incorrect, right?

09:42 20      A.   I couldn't answer that question sir because that

21  would be a communication between IT department, sir.

22      Q.   Did Sprint produce any documentation of any kind

23  of which you are aware that would suggest that Ms. O'Neal

24  was incorrect with regards to her representation that this

09:42 25  was not her bill?

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

45

1      A.   Again, sir, that goes back to the exchange

2  between IT, and I don't know, sir.

3      Q.   I'm asking you what you know or what you don't

4  know as you sit here today as a corporate representative

EXHIBIT 6

o'neal.txt

09:42 5 for the company.

6    A.    Absolutely what I do know is that I can go into

7  Sprint system and look at the bills.

8    Q.    What I would like to do at this point in time, I

9  know we have another case, but the questions and the

09:43 10  responses today, I don't think I have any choice but to

11  seek to suspend the deposition and try to reconvene at a

12  later day that's permissive.

13        MR. BRODERICK:  We're going to object to any

14  further deposition.  You can seek whatever you wish.  Are

09:43 15  you done with your questions?

16        MR. GADD:  At this point in time, until we can

17  get to a clarity with respect to the answers, I don't

18  think so I have a choice.

19        MR. BRODERICK:  What answers are you lacking that

09:43 20  Mr. Juarez is not answering?

21        MR. GADD:  I repeatedly asked him for information

22  that he knows or doesn't know with regards to firsthand

23  knowledge regarding the back and forth on this case with

24  Sprint.  He continually -- his belief in the process.  I'm

09:43 25  asking for very specific, very simple information

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

46

1  regarding what he did know or what he didn't know

2  regarding this account.  He continually refers to the IT

3  department.  He continually refers to documentation that

4  he claims he could have accessed, but he didn't.  And he

09:44 5  goes on and on and on.

6        I'm not trying to be difficult here.  I don't

7  think I have any choice with the answers I'm getting.

Page 41

EXHIBIT 6

o'neal.txt

         8          MR. BRODERICK:  You can make an application to

         9     the court if you want.  He's here.  He answered your

09:44 10     questions.

        11          MR. GADD:  I would disagree.  If you want to have

        12     a chat with him and come back, that's great.  I'm not

        13     satisfied with the answers.  I'm asking for what he either

        14     knows or what he doesn't know and I'm not getting answers

09:44 15     to that.

        16               I think his testimony would suggest otherwise.

        17          MR. BRODERICK:  I disagree.  If you want to go to

        18     the court, go to the court.

        19          MR. GADD:  Do you want to discuss this with your

09:44 20     client?  If not, I'm going to terminate the deposition and

        21     we'll resume the next one.  In my mind, these are

        22     things -- he received documents and he knows or doesn't

        23     know.

        24          MR. BRODERICK:  You made your record.  I made

09:45 25     mine.  If you want to terminate the deposition, terminate

               UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

                                                            47


         1     the deposition.

         2               Are we going to terminate the deposition for the

         3     O'Neal case?

         4          MR. GADD:  Yes, unless you want to discuss with

09:45  5     him about giving factual responses to the questions I

         6     presented.

         7          MR. BRODERICK:  He answered every question he

         8     could.  I don't know what specific questions that you

         9     think he could look up.  No.  He's answered.  If you want

09:45 10     to go to the court, go to the court.

EXHIBIT 6

o'neal.txt

11        MR. GADD:  I asked him to provide information

12  about what he does or do not personally know with regards

13  to the information.  He doesn't want to answer or commit

14  to an answer that is in one way, shape or form.  It's

09:46 15  vital.  If he knows she disputed the account as of

16  10-13-2013 and safely resumed the calling process

17  irregardless of having heard back from them, I think

18  that's an issue.  I think it's a problem.

19        MR. BRODERICK:  Look, the record is what it is.

09:46 20  Either you can ask questions or we could terminate the

21  deposition.  But the record is what it is.

22        MR. GADD:  If you would like to instruct the

23  answer to those questions.  I'm not getting the answers.

24        MR. BRODERICK:  I haven't asked him not to answer

09:46 25  a single question today and he answered every question to

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

48

1  the best of his ability.

2        MR. GADD:  I appreciate the fact you've not done

3  that, but I'm not getting answers to the questions.  I'm

4  getting illusions to a process that he apparently was not

09:46 5  a part of.

6        MR. BRODERICK:  If you're not happy with the

7  answers, you can move to compel with the court.

8        MR. GADD:  Okay.

9        MR. BRODERICK:  Let's go off the record.

09:47 10        (Discussion off the record.)

11        (Whereupon, the deposition concluded at a.m.)

12

13

EXHIBIT 6

o'neal.txt
JONATHAN JUAREZ

14

15

16

17

18

19

20

21

22

23

24

25

UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

♀

49

1  STATE OF ARIZONA      )
                         ) ss.
2  COUNTY OF MARICOPA     )

3        I HEREBY CERTIFY that the foregoing deposition

4  was taken by me pursuant to Notice; that I was then and

5  there a Certified Court Reporter for the State of Arizona,

6  and by virtue thereof authorized to administer an oath;

7  that the witness before testifying was duly sworn by me to

8  testify to the whole truth and nothing but the truth;

9  pursuant to request, notification was provided that the

10  deposition is available for review and signature; that the

11  questions propounded by counsel and the answers of the

12  witness thereto were taken down by me in shorthand and

13  thereafter transcribed through computer-aided

14  transcription under my direction, and that the foregoing

15  typewritten pages contain a full, true, and accurate

16  transcript of all proceedings had upon the taking of said

Page 44

EXHIBIT 6

o'neal.txt

17    deposition, all done to the best of my skill and ability.

18          I FURTHER CERTIFY that I am in no way related to

19    nor employed by any of the parties hereto, nor am I in any

20    way interested in the outcome hereof.

21          DATED at Phoenix, Arizona, this day day of April,

22    2016.

23

24                    YVONNE WHITEFIELD
                      Certified Court Reporter
25                    Certificate No. 50611


           UNEDITED UNCERTIFIED ROUGH DRAFT TRANSCRIPT

EXHIBIT 6